*339
 
 Opinion
 

 SCOTT, Acting P. J.
 

 Beverly and John Webb separated in 1974, after 23 years of marriage. Two years later, an interlocutory decree of dissolution was entered. Mrs. Webb was 44 years old and Mr. Webb was 45. Two of their five children were still minors. Custody of the minor daughter was awarded to Mrs. Webb, and the minor son to Mr. Webb. For 17 of the years of his marriage John Webb had been a San Francisco police officer. He had retired from the police department in 1970 with a permanent disability. At the time of trial, he operated a private investigation business known as Jack Webb Associates. Mrs. Webb had not been employed during the marriage. At the time of the interlocutory decree, she had been employed for about a year on an intermittent part-time basis, doing light office work.
 

 Mrs. Webb appeals from the judgment of the trial court. The principal issue on appeal is whether Mr. Webb’s pension from the San Francisco Police Department is a disability pension which is his separate property, or whether it is a longevity retirement pension which is community property subject to division. (See
 
 In re Marriage of Jones
 
 (1975) 13 Cal.3d 457 [119 Cal.Rptr. 108, 531 P.2d 420].) The other issues presented concern the amount and duration of spousal support awarded to Mrs. Webb, and the goodwill value of Mr. Webb’s private investigation business.
 

 I.
 

 The Pension
 

 At the time of the interlocutory judgment, Webb received a pension of approximately $755 per month from the San Francisco Police Department. The pension was paid pursuant to section 8.547 of the San Francisco Charter, entitled “Retirement for Incapacity,” which provides that an incapacitated officer is to receive a monthly retirement allowance calculated by his final compensation times his percentage of disability, not to exceed 90 percent. Webb was considered to be 80 percent disabled. His disability stemmed from arthritis of the neck and shoulders and an ulcer condition.
 

 The San Francisco Charter also provides for “Service Retirement,” or longevity retirement, for a police officer who completes at least 25 years of service and attains the age of 50, at a retirement allowance equal to 55
 
 *340
 
 percent of his final compensation plus 3 percent of that final compensation for each year of service in excess of 25 years. (§ 8.546.) When a policeman who is retired for incapacity reaches the age at which he would have qualified for service or longevity retirement but for his disability, his retirement allowance is recalculated. His monthly allowance is then to equal the amount he would have received had he worked without interruption until eligible for service retirement, in the rank held by him when he retired. (§ 8.547.)
 

 The trial court found that Webb’s police pension is for disability, and that even after he reaches age 50 in 1981, the pension will remain a disability retirement allowance which will continue to be his separate property. Mrs. Webb does not dispute the finding that the benefits are currently separate property.
 
 [1]
 
 She does, however, contend that the court erred in concluding that the benefits will remain separate property after Webb attains age 50. Her contention is grounded on the assertion that the recalculation of the retirement for incapacity allowance at age 50 converts it into a longevity allowance which must be divided as community property pursuant to the principles articulated in
 
 In re Marriage of Brown
 
 (1976) 15 Cal.3d 838 [126 Cal.Rptr. 633, 544 P.2d 561],
 

 The most recent case concerning the “disability pension” versus the “service retirement pension” dichotomy is
 
 In re Marriage of Stenquist
 
 (1978) 21 Cal.3d 779 [148 Cal.Rptr. 9, 582 P.2d 96]. At issue in
 
 Stenquist
 
 was the military “disability pension” of a retired serviceman. Despite a service-related injury assigned an 80 percent disability rating, he remained in military service for 17 years before retiring. Upon retirement, the benefits available to him were either regular “retirement” pay at the rate of 65 percent of his basic pay, or “disability” pay, 75 percent of his basic pay. Assuming he would elect the higher amount, the Army began making “disability” payments to him.
 

 Expressly disapproving language in
 
 In re Marriage of Jones, supra,
 
 13 Cal.3d 457 and
 
 In re Marriage of Loehr
 
 (1975) 13 Cal.3d 465 [119
 
 *341
 
 Cal.Rptr. 113, 531 P.2d 425] suggesting a contrary result, the court in
 
 Stenquist
 
 rejected the husband’s argument that his entire “disability” pension was separate property. The court held that only the excess of the “disability” pension rights over the alternative “retirement” pension represented additional compensation attributable to the disability; the balance of the pension rights acquired during the marriage served to replace ordinary retirement pay and therefore was to be classified as a community asset.
 

 The
 
 Stenquist
 
 court offered two justifications for its holding. First, permitting the serviceman to elect a disability pension arid thus defeat the community interest in his right to a longevity pension would violate the principle that one spouse cannot, by invoking a condition wholly within his or her control, defeat the community interest of the other spouse. Second, despite the label “disability,” only a portion of the pension benefits were properly allocable to disability. The court noted that military retirement pay based on disability serves dual purposes: to compensate for loss of earnings and diminished ability to compete in the civilian job market, and to provide support for the serviceman and his spouse after he leaves the service. The court stated that as the veteran approaches normal retirement age, the latter purpose becomes the predominant function served by the “disability” pension.
 

 The holding in
 
 Stenquist
 
 was expressly made retroactively applicable to cases in which the adjudication of property rights arising from marriage is still subject to appellate review. (21 Cal.3d at p. 791, fn. 14.)
 

 Superficially at least, this case is distinguishable from
 
 Stenquist.
 
 In
 
 Stenquist,
 
 the serviceman could make an election, thus determining whether the pension was a disability or a retirement pension. As the court stated: “We cannot permit the serviceman’s election of a ‘disability’ pension to defeat the community interest in his right to a pension based on longevity.” (21 Cal.3d at p. 786.) No such election was available to Webb in the instant case. However, when we look at the second factor supporting the
 
 Stenquist
 
 decision and attempt to assess the predominant function served by Webb’s so-called incapacity allowance
 
 after he
 
 reaches age 50, it becomes more difficult to distinguish this case from
 
 Stenquist.
 

 We are well aware of the factual differences between the two cases. Unlike Stenquist, whose military career spanned 26 years despite the amputation of his left forearm, Webb retired prematurely from the police force because of his disability. Stenquist did not begin to receive his
 
 *342
 
 “disability” pension until 17 years after his disabling injury; Webb has been receiving disability payments since 1970. The value of Stenquist’s disability pension depended largely on the rank he had achieved at the time of his retirement and was unrelated to his rank when injured; the amount of money Webb will receive after age 50 will depend at least in part upon the rank he held at the time he became disabled. Finally, the “disability” pension Stenquist was receiving was higher than the retirement allowance of a healthy serviceman of equal rank and longevity; however, when Webb’s pension is recalculated at age 50, he will not receive any excess amount over a service retirement pension attributable to his disability.
 
 [2]
 

 Despite these substantial diffe* onces, we do not read
 
 Stenquist
 
 as limited to its unusual facts.
 
 Stenquist
 
 compels us to look behind labels and determine the primary objective of a “disability” pension once its recipient reaches normal retirement age. The
 
 Stenquist
 
 court described that case as illustrating the point that the objective of providing support for the retiree may become the predominant function served by the “disability” pension, notwithstanding its label. (21 Cal.3d at p. 787.) We conclude that the facts before us present merely a different illustration of that point.
 

 After Webb reaches age 50, his pension benefits will not be related to his percent disability, but to the years of service he would have rendered but for that disability. His disability will then be significant only in that his allowance will be computed as if he had continued uninterrupted service in the rank he held when retired for incapacity. Because Webb’s retirement benefits will be recalculated to parallel those received by officers who earn service retirement, it appears that the predominant function of those benefits after age 50 is to provide for support as if Webb had retired for service, and not to continue to compensate him for loss of earnings resulting from compelled premature retirement and diminished ability to compete in the employment market.
 

 Consequently, as “[i]t would be unjust to deprive wife of a valuable property right simply because a misleading label has been affixed to husband’s pension fund benefits”
 
 (Stenquist,
 
 21 Cal.3d at pp. 786-787), it
 
 *343
 
 appears that the trial court erred in finding that Webb’s pension remains separate property after he reaches age 50.
 

 We turn now to the question of how the pension benefits should be divided when Webb is 50. The trial court’s method approved in
 
 Stenquist
 
 involved several steps. That court compared the difference between the “disability” pension and the lesser “retirement” pension alternatives; the excess amount over and above what would be received as a retirement pension was separate property. The court also established a ratio between the years of the Stenquists’ marriage until the husband’s retirement and his total years of military service. That ratio was applied to the “retirement” pension to compute how much was accrued during coverture and was therefore community; one half of that amount was the wife’s share. (21 Cal.3d at p. 784.) The
 
 Stenquist
 
 court described the method as a “simple mathematical computation based on the relationship of the ‘disability’ pension to an alternative ‘retirement’ pension.” (21 Cal.3d at p. 785, fn. 4.) However, that same computation cannot be applied to the facts before us, as Webb will have no choice between alternatives which can be compared. Our computation must also account for the fact that Webb’s service with the police force terminated when he became disabled, in contrast to the husband’s uninterrupted career in
 
 Stenquist.
 

 Under the facts here, to determine the proper formula it seems appropriate to apply the principle articulated in
 
 Marriage of Brown, supra,
 
 15 Cal.3d at page 842: “to the extent that [pension] rights derive from employment during coverture, they comprise a community asset subject to division in a dissolution proceeding.” To this end, the proper method is to calculate the ratio between the number of years Webb was employed as a policeman during the marriage and the total number of years from the date of his hiring by the department to the date he would become eligible for service retirement but for disability. By this formula, the community interest in the pension to be received after Webb reaches 50 would be 17/25ths; one half of that amount is appellant’s share.
 

 The trial court here determined that the community interest in Webb’s pension was $8,285, which apparently represents his contribution to the retirement fund during marriage. That sum will have to be recalculated on remand.
 

 
 *344
 
 II.
 

 The Goodwill
 

 The only other asset whose value is disputed by the parties is the goodwill of Webb’s private investigation business. The court found the goodwill value of the business to be $16,000. Goodwill may exist in a professional practice or in a business which is founded upon personal skill or reputation.
 
 (In re Marriage of Foster
 
 (1974) 42 Cal.App.3d 577, 582, fn. 2 [117 Cal.Rptr. 49].) The parties apparently agree that a private investigation service is such a business.
 

 The question of goodwill is a question of fact; each case must be determined on its own facts and circumstances, and the evidence must be such as legitimately establishes value. Opinion evidence is admissible but not conclusive. The trier of fact may take into consideration the situation of the business premises, the amount of patronage, the personality of the parties engaged in the business, the length of time the business has been established, and the habit of its customers in continuing to patronize the business. The court may also take into consideration the market value at which the business goodwill could be sold on dissolution of the marriage.
 
 (In re Marriage of Foster, supra,
 
 42 Cal.App.3d at p. 583.)
 

 Mrs. Webb’s expert testified that the value of the goodwill of Mr. Webb’s business was $31,468. He conceded, however, that he had never valued a private investigation firm and had no knowledge relative to the selling price of the firm. He further admitted that the rate of capitalization he had selected was somewhat arbitrary. Mr. Webb testified that he knew of no private investigating firm that had been sold in Northern California in recent years, and that the goodwill of the business had no market value.
 

 The issue before this court is not whether some formula which was suggested but not accepted by the court
 
 could have been
 
 accepted as a proper means of arriving at the value of the goodwill, but rather, was the formula which the court applied a proper one, and is there evidence to support the court’s decision.
 
 (In re Marriage of Fortier
 
 (1973) 34 Cal.App.3d 384, 389 [109 Cal.Rptr. 915].) Apparently the trial court did not accept Mrs. Webb’s expert’s formula of calculating the goodwill of Mr. Webb’s business; instead, the trial court combined the capitalization of excess earnings ($31,468) with the nominal market value testified to by Mr. Webb, and concluded the goodwill value of the business was $16,000.
 
 *345
 
 Mrs. Webb offers no authority suggesting such is not an acceptable formula, and it cannot be said that there was no evidence to support that conclusion.
 

 The parties do not contest the valuation placed upon other items of community property and the manner in which that property was distributed to the parties. However, in light of our holding regarding the pension, it will be necessary for the trial court to recalculate the total value of the community assets, to the end that an appropriate and equal division can be made.
 

 III.
 

 Spousal Support
 

 A.
 
 The Amount
 

 Mrs. Webb further contends that the trial court abused its discretion as to the amount and division of spousal support. The trial court ordered Mr. Webb to pay Mrs. Webb $250 per month spousal support for three years, and $50 per month for an additional seven years, at which time the obligation to pay spousal support would terminate.
 

 Although not unlimited, a trial court’s discretion is broad in setting the amount of spousal support to be awarded upon dissolution of marriage.
 
 (In re Marriage of Morrison
 
 (1978) 20 Cal.3d 437, 452 [143 Cal.Rptr. 139, 573 P.2d 41].) At the time of the interlocutory judgment in this case, Civil Code section 4801, subdivision (a) authorized the trial court to order a party to pay spousal support in “any amount, and for such period of time, as the court may deem just and reasonable having regard for the circumstances of the respective parties, including the duration of the marriage, and the ability of the supported spouse to engage in gainful employment without interfering with the interests of the children of the parties in the custody of such spouse.” (Stats. 1969, ch. 1608, § 8, p. 3333.)
 

 At the time of the order, Webb received income from three sources: approximately $805 a month from his disability benefits, $100 a month rent from real property, and his income from Jack Webb Associates. The record is unclear as to his income from his business; however, he testified that his 1975 after tax income from the business was about $7,500. Mrs. Webb’s income, in addition to spousal support, was approximately $100
 
 *346
 
 per month rental income plus about $210 a month from her part-time job. She testified that her income was from the part-time job and that she intended to work full time in about two or three years, when her girls grew older. At the time she had her 17-year-old and 18-year-old daughters living with her. She is apparently in good health. Webb testified that he was able to work only four or five hours a day because of his physical disabilities. From this evidence it does not appear that there was an abuse of discretion in the spousal support award.
 

 B.
 
 Termination
 

 A trial court should not terminate jurisdiction to extend a future support order after a lengthy marriage, unless the record clearly indicates that the supported spouse will be able to adequately meet his or her financial needs at the time selected for termination of jurisdiction. The court must rely only on the evidence in the record and the reasonable inferences to be drawn therefrom; if the record does not contain evidence of the supported spouse’s ability to meet his or her future needs, the court should not “burn its bridges” and fail to retain jurisdiction.
 
 (In re Marriage of Morrison, supra,
 
 20 Cal.3d 437, 453.)
 

 The record here does not contain evidence that the supported spouse will be able to adequately meet her financial needs. The court erred in not reserving jurisdiction relative to spousal support. It may well be upon remand, with additional evidence before the court as to the pension benefits to which Mrs. Webb will become entitled, that such a termination order would be altogether proper.
 

 Judgment is reversed and the cause remanded for further hearings in accordance with the views herein expressed. Each party to bear his own costs.
 

 Feinberg, J., and Halvonik, J., concurred.
 

 A petition for a rehearing was denied July 20, 1979.
 

 [1]
 

 In
 
 In re Marriage of Jones
 
 (1975) 13 Cal.3d 457 [119 Cal.Rptr. 108, 531 P.2d 420], the court held the right to disability pay does not comprise a community asset and is not subject to division upon dissolution. That decision has been disapproved to the extent it is inconsistent with
 
 In re Marriage of Stenquist
 
 (1978) 21 Cal.3d 779 [148 Cal.Rptr. 9, 582 P.2d 96], to be discussed
 
 infra.
 
 The dissent in
 
 Stenquist
 
 reads the majority’s decision to mean that the employee who retires for disability must
 
 immediately
 
 pay part of the disability pension to the former spouse (at p. 798). Such a result is not urged or is it tenable under the facts of this case. Here, before age 50, Webb is entitled to no pension other than a disability pension, which is his separate property.
 

 [2]
 

 The majority in
 
 Stenquist
 
 reject the dissent’s view that allocation of the “disability” pension between separate and community interests discriminates against the disabled. The majority compare healthy and disabled workers who are both receiving pensions, and state that “under the allocation formula set forth . . . the disabled worker usually will retain a higher percentage of the benefits.” (21 Cal.3d at p. 788, fn. 10.) However, no such higher percentage will be available to Webb.