[Civ. No. 6579. Fifth Dist. July 13, 1983.]

In re the Marriage of ELIZABETH GAY and
WILLIAM JOSEPH ASBURY.
ELIZABETH GAY ASBURY, Respondent, v.
WILLIAM JOSEPH ASBURY, Appellant.

## Counsel

Wild, Carter, Tipton & Oliver and Trevor C. Clegg for Appellant.

Chinello, Chinello, Shelton & Auchard and John D. Chinello, Jr., for Respondent.

OPINION

BROWN (G. A.), P. J.—The husband, William Joseph Asbury, appeals from a judgment of dissolution of his marriage to Elizabeth Gay Asbury (now McNabb; hereinafter wife) insofar as the judgment determines the value of the wife's interest in their joint orthodontic practice; more particularly, the value of her interest in the intangibles of the practice.

Both the husband and the wife are licensed dentists, specializing in orthodontics. They were married on September 13, 1975, and separated on March 6, 1978. The wife continued to work at their joint office until May 5, 1978, when she left the joint practice. She took with her, pursuant to mutual agreement, certain patients, their records, and a small quantity of orthodontic supplies. She thereafter practiced on her own at a new location.

The valuation testimony was presented by two experts. Dillan J. Gnagy, a certified public accountant, testified as a witness for the husband. T. Thomas Mott, a certified public accountant, testified for the wife.

In order to isolate, understand and properly analyze the narrow issue before us, it is essential that the valuation methodology be generally summarized.

Gnagy used a gross income theory to value the entire business—both tangible and intangible—and the value of the business the wife took with her. Mott valued the tangible and intangible assets separately, using the gross income theory to value the intangible assets only. Mott accepted the basic income data developed by Gnagy.

More precisely, Gnagy calculated the value of the husband's practice at the time of marriage as follows: fees collected for the six months preceding the date of marriage were $46,134, translating into an annualized volume of $92,228.68; 70 percent of this figure, or $64,506,[1] was the market value of the entire practice at the date of marriage. $27,705 was still owing by husband on the original purchase price of the practice, so Gnagy subtracted this amount owing from the market value to reach a net value for the orthodontic practice at the time of marriage of $36,855. He calculated the value of the joint orthodontic practice as of the date the practice was divided by the parties—May 1978—in a similar manner: fees for the six months preceding May 1, 1978, were $87,948.40, an annualized volume of $175,896.80; 70 percent of that figure gave a market value of $123,128. $10,609 was still owing on the original purchase price of the practice, leav-

---

[1]See footnote 1 of exhibit 1.

ing a net value for the joint orthodontic practice at the time it was divided, by the parties of $112,519. Gnagy calculated that a 10 percent rate of return on husband's original separate property practice, valued at $36,855 just prior to marriage, increased the separate property value as of May 1978 by $9,214, for a total separate value of $48,069, leaving a net community equity in the joint orthodontic practice as of May 1978 of $66,450. Gnagy then calculated the value of the practice taken by wife in May 1978: the fees she received for the two months ending June 30, 1978, were $13,713.96, an annualized volume of $82,283.76, having a 70 percent market value of $57,599. Since wife was entitled to one-half of the community equity in the joint practice, or $33,225, Gnagy concluded that wife had taken in excess of $24,374 worth of community equity (the difference between $57,599 and $33,225) in the mutual division of the joint practice in May 1978. Attached as exhibit 1 is a summary of Gnagy's calculations.

Wife's expert witness testified that the gross income theory used by Gnagy to value the orthodontic practice was an acceptable method, but that he (Mott) used a different valuation system. Unlike Gnagy, who valued the practice as an indivisible unit, Mott valued the tangible assets—cash, accounts receivable, and equipment—separately from the intangible assets—goodwill or going business value. Mott compared the value of the tangible assets of the orthodontic practice at the time of marriage with the value for those same assets as of May 1978, including decreases in the debts of the practice over the relevant period, and calculated that the practice's tangible assets increased by $71,009 during the marriage. This figure was later reduced by $4,000.

Mott calculated the increase in value of the intangible assets of the orthodontic practice during the marriage, using the annualized gross income figures prepared by Gnagy, as follows: the annualized gross income before marriage was $92,228 and in May 1978 was $175,896; the difference, $83,668, represented the increase in value of intangible assets attributable to the period of coverture. Half of that increase, or $41,834, was wife's community property share of the intangible assets of the practice as of May 1978. Thus, rather than 70 percent of the increase in value, Mott used 100 percent of the increase in value.

As to the value of the practice the wife took with her, Mott testified on rebuttal that the fees collected by wife in the two months after the practice was divided included payments for patients from an unrelated practice, reducing collections attributable to the community practice to $10,290 for two months, or an annualized volume of $61,740 times 70 percent, or $43,218. Thus, Mott used a 70 percent figure to calculate the value of the practice

the wife took with her. Attached as exhibit 2 is a summary of Mott's calculations.

The trial court's analysis of the valuation of the orthodontic practice is revealed by the notice of intended decision filed on December 15, 1980:[2]

"Award to Petitioner:

"$ 41,834.00—one-half of intangibles
$ 25,159.00—one-half of tangibles[3]
"$ 66,993.00

"less $ 43,218.00—(amount already received by
 Petitioner, 70% of $10,290.00
 annualized)
 _____
 $ 23,775.00

 ($ 9,214.00) [Interest on husband's separate
 property investment]

Respondent's separate property interest:

$ 23,775.00

"less $ 9,214.00 [Later corrected to a deduction of
 one-half of this figure]
 14,561.00

"plus $ 1,300.00 (Dr. Mott's charges)
 $ 146.00 (costs)
 $ 16,007.00 (net figure)"

In his objections to proposed findings of fact and conclusions of law, husband argued that the trial court had used Mott's "100 percent" valuation method in determining the amount by which the orthodontic practice had grown between the date of marriage and May 1978, but then had assigned Gnagy's "70 percent" valuation method in determining the value of the portion of the joint practice taken by wife in May 1978.

The trial court rejected husband's argument that either the 100 percent method or the 70 percent method should have consistently been used

[2]The only part of this calculation that is relevant to the issue on appeal is the valuation of the intangible assets.

[3]It is impossible to determine how the trial court derived this amount for value of tangible assets. Since the figure is not in dispute, there is no issue regarding it.

throughout the valuation process. The court stated: "Now, let me just say this, that I think that I did hear with regard to this hundred percent versus seventy percent thing that's involved in the objections, I treated the Petitioner's interest on the seventy percent of annualized income basis because she was—because there was—it was in the nature of a transfer to her, is what I was looking at. And treated the Respondent's at the one hundred percent because there wasn't anything like a transfer involved. He simply kept his share intact—intact and continued right on with all the goodwill, location, everything else unchanged. That was what I believed I had in mind when I treated their respective interests in different ways."

The judgment ultimately filed recited that husband should pay wife $19,168 to equalize division of the community property orthodontic practice. Other adjustments irrelevant to this appeal brought the total amount owed by the husband to $24,412.96. Judgment was entered for that amount.

■ Valuation of items of community property in a dissolution proceeding is a question of fact for the trial court. (*Bensing* v. *Bensing* (1972) 25 Cal.App.3d 889, 895 [102 Cal.Rptr. 255].) This includes valuation of the goodwill of a business. "[E]ach case must be determined on its own facts and circumstances, and the evidence must be such as legitimately establishes value. Opinion evidence is admissible but not conclusive. The trier of fact may take into consideration the situation of the business premises, the amount of patronage, the personality of the parties engaged in the business, the length of time the business has been established, and the habit of its customers in continuing to patronize the business. The court may also take into consideration the market value at which the business goodwill could be sold on dissolution of the marriage. [Citation.]" (*In re Marriage of Webb* (1979) 94 Cal.App.3d 335, 344 [156 Cal.Rptr. 334].) ■ The trial court has discretion to divide community assets in any fashion which complies with Civil Code section 4800. (*In re Marriage of Brown* (1976) 15 Cal.3d 838, 848, fn. 10 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164].)[4] ■ Where a finding of value of a community asset is challenged on appeal on the ground that there is no substantial evidence to sustain it, the appellate court is limited to a determination of whether there is any substantial evidence, contradicted or uncontradicted, which supports the finding of fact. (*Bensing* v. *Bensing, supra,* 25 Cal.App.3d at p. 895.)

■ As is apparent, the trial court accepted Mott's figures and method of calculation. Thus, as above stated, in placing a value on the intangibles of the joint practice, the court used 100 percent of the annualized income; but in placing a value on the intangibles of what the wife took with her, it used 70 percent of the annualized income.

---

[4]*Marriage of Brown* dealt with division of nonvested pension rights and not valuation of those rights. (See *id.,* 15 Cal.3d at pp. 848-849.)

Husband argues that the court was required to be consistent in this regard, that is, to use either the 70 percent or the 100 percent figure in each instance. He argues that employment of the "inconsistent" method used either overvalues the joint practice by 30 percent or undervalues the practice the wife took with her by 30 percent, depending upon which way one approaches the problem.

This issue was vigorously argued upon the objections to the findings of fact and conclusions of law. It clearly appears the court deliberately applied the differing percentages based upon the fact that essentially the wife took only patients and had to move to a new location, while the husband "simply kept his share intact—intact and continued right on with all the goodwill, location, everything else unchanged."

Appellant's basic assumption is that there is no disagreement between the experts as to the valuation of the intangibles and that Mott agreed not only with the percentage method of valuation but upon the percentage used by Gnagy. We think this assumption is in error and is not borne out by the record. While Mott agreed generally with Gnagy's percentage method of valuing all the assets (both tangible and intangible), Mott valued the tangible and intangible assets separately and, insofar as we have been able to ascertain, did not specifically agree that a 70 percent factor under all circumstances was correct.

Moreover, Mott used a 100 percent factor times earnings when valuing the joint practice. He was not cross-examined about the use of a 100 percent factor, but the fact is that he used that percentage. He used a 70 percent factor when calculating the value of the practice the wife took with her. Mott then compared the amount the parties should have received under his theory with the amount of actual collections, and the result indicated that the parties had split the intangible values of the practice along lines that were approximately correct. Mott said:

"A. Well, those figures tell me—first of all, it's very difficult to measure intangible value of any going business, but those figures tell me that, assuming my calculations were correct, that the intangible value of the dental practice that what the individual doctors ended up with, was approximately correct."

Regarding the basic approach concerning a percentage factor times earnings, Mott testified:

"Q. Well, now, all of this is very interesting. Do you agree with this method of computation?

"A. Well, I agree with the basic approach for valuing the patients. I did not use an interest factor, which Mr. Gnagy did, and I didn't feel it was appropriate in this situation, because Dr. McNabb is an active part of the practice. Mr. Gnagy indicated that his valuation for the purchase price of a practice included the underlying assets, the equipment. Well, I think normally when a practice would be purchased it would include the equipment and the patient files, and the patient records, but normally would not include accounts receivable, would not include cash, would not include debt or reduction of debt. And so I think that his basic approach in determining the value of the patients is correct except for the interest factor, which I don't— don't agree with. But it does not take into account the fact that Dr. McNabb did not receive any of the increase in value of the tangible assets. She didn't receive any equipment, she didn't get her share of the increase in cash, she didn't get her share of the increase of accounts receivable, she didn't get her share of the decrease of the liabilities, and in my opinion she's entitled to that.

"Q. So that what you're saying as far as this list that Mr. Gnagy has there really doesn't go far enough to evaluate the community property interest in the business; is that correct?

"A. That's correct, it merely values the patients.

"Q. Now, you have already testified as far as the patients were concerned; they both come out somewhat equally, is that correct?

"A. According to my calculations, pretty close."

We conclude that the trial court's decision to apply different percentage factors to the valuation of intangible assets under the circumstances herein is adequately supported by the expert testimony referred to and the record as a whole. (See *In re Marriage of Folb* (1975) 53 Cal.App.3d 862 [126 Cal.Rptr. 306].)

The judgment is affirmed.

Zenovich, J., and Andreen, J., concurred.

A petition for a rehearing was denied August 1, 1983, and appellant's petition for a hearing by the Supreme Court was denied September 29, 1983.

Exhibit 1

SUMMARY OF TESTIMONY OF DILLAN J. GNAGY, C.P.A.
VALUATION OF BOTH TANGIBLE AND INTANGIBLE ASSETS

| | | |
|---|---|---|
| Value of practice at time of marriage | $92,228 × 70% = | $ 64,506*[1] |
| Less amount owed on purchase price | | 27,705 |
| Net value of husband's separate interest | | 36,855 |
| | | |
| Separate property value of husband as of May 1978 | $36,855 + $9,214[2] | 48,069* |
| | | |
| Value of practice on date divided May 1978 | $175,896 × 70% = | 123,128* |
| Less amount owed on purchase price | | 10,609 |
| Net value of joint practice | | 112,519 |
| | | |
| Net community equity in practice May 1978 | $112,519 − $48,069* = | 66,450* |
| Wife's interest | 50% × $66,450* = | 33,225* |
| | | |
| Value of practice taken by wife: Annualized volume on accounts taken by wife | | 82,283 |
| Fees generated annually by wife | $82,283 × 70% = | 57,599 |
| Less wife's one-half interest in practice | = | 33,225* |
| Excess community equity taken by wife | = | 24,374* |

Exhibit 2

SUMMARY OF TESTIMONTY OF T. THOMAS MOTT, C.P.A.
VALUATION OF TANGIBLE ASSETS

| | | |
|---|---|---|
| Community value of tangible assets | $50,318 × 50% = | $ 25,159[1] |

VALUATION OF INTANGIBLE ASSETS
JOINT PRACTICE

| | | |
|---|---|---|
| Annualized gross income date of separation, May 1978 | $175,896[2] × 100% = | 175,896 |
| Less annualized gross income date of marriage, 9/13 | $ 92,228[2] × 100% = | 92,228 |
| Increase in value during marriage | | 83,668 |
| Wife's community interest | $83,668 × 50% = | 41,834 |

VALUE OF COMMUNITY PROPERTY
WIFE TOOK WITH HER

| | | |
|---|---|---|
| Fees generated annually by wife from accounts taken: | | 61,740[3] |
| | $61,740 × 70% = | 43,218 |

[1]Whether due to arithmetical error by Gnagy or transcription error by the court reporter, many of the calculated figures used by Gnagy, as indicated in the reporter's transcript, were inaccurate (and are marked herein by an asterisk). Since the trial court did not accept or use the inaccurate figures, they had no effect upon the judgment.

[2]Increase of separate property value during marriage: $36,855 × 10% per year for 30 months = $9,214

[1]Method of calculation not apparent. Amount not in dispute.

[2]Source is Gnagy data.

[3]Derived from the corrected two-month income figure of $10,290.