[S.F. No. 24613. Dec. 31, 1985.]

In re the Marriage of EILEEN K. and ERNEST J. SASLOW.
EILEEN K. SASLOW, Appellant, v.
ERNEST J. SASLOW, Appellant.

**COUNSEL**

Grant D. Telfer, Diane S. Gersten, Frederick A. Meiser, Jr., Jenkins & Perry and Howard D. Finkelstein for Appellant Wife.

Goldberg, Fisher, Randall & Quirk, Roger D. Randall and Edward J. Quirk for Appellant Husband.

**OPINION**

**BIRD, C. J.**—Where disability insurance policies are purchased during marriage with community funds, but the benefits are received after the parties have separated, are the benefits the separate property of the disabled spouse?

I.

After 18 years of marriage, Eileen and Ernest Saslow (hereafter wife and husband respectively) separated in 1975.

During the marriage, the husband purchased several disability insurance policies payable upon his disability. He paid the premiums with community funds. Although the couple owned several orange groves, a residence, some

stocks, and eight life insurance policies, the husband did not invest in a retirement or pension plan.

Prior to 1972, the husband had an active private medical practice as an allergist. He was forced to close his office in 1972 because of long-standing psychological problems. The deposition testimony of his psychiatrist indicated that the husband, who was 59 years old at the time of trial in 1978, was likely to remain disabled for the rest of his life. The wife suffers from Hodgkin's disease.

When he was unable to continue his practice and while the parties were still married, the husband began to receive benefits payable under the disability policies. The benefits totaled $2,181 per month until the husband reached the age of 60, when one of the policies expired and the benefits were reduced to $1,881 per month. A second policy will expire and the benefits from another policy will decrease when the husband reaches age 70, reducing the monthly payments to $631. When the husband reaches age 75, a third policy will expire and the benefits will be reduced to $506 per month. That amount will be payable each month until the husband's death.

The trial court entered an interlocutory decree of dissolution on May 15, 1978, but reserved jurisdiction to determine the division of property. After an eight-day trial, the court found the bulk of the couple's substantial assets to belong to the community and divided them equally. The future benefits to be paid to the husband from the disability policies were found to be his separate property. He was ordered to pay half of the benefits as spousal support.

The wife's primary argument on appeal is that the benefits from the disability policies, which were purchased with community funds, are community property and must be divided equally between the parties upon dissolution. ▪ She notes, correctly, that although she is receiving spousal support equivalent to half of the disability payments, "[spousal support] lies within the discretion of the trial court and may be modified with changing circumstances: 'the spouse "should not be dependent on the discretion of the court . . . to provide her with the equivalent of what should be hers as a matter of absolute right." ' " (*In re Marriage of Stenquist* (1978) 21 Cal.3d 779, 787, fn. 8 [148 Cal.Rptr. 9, 582 P.2d 96], hereafter *Stenquist;* accord *In re Marriage of Brown* (1976) 15 Cal.3d 838, 848 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164].)

The wife also argues that the trial court abused its discretion in finding that (1) the proceeds from a certain trust were community property, (2) several life insurance policies owned by the wife were community property,

(3) the wife was not entitled to credit for funds loaned to the husband from her separate property prior to and early in the marriage, and (4) she was not entitled to reimbursement for allegedly separate property funds spent on community debts after separation. Finally, the wife contends that the trial court abused its discretion in failing to order the husband to account for certain community funds spent on stock and mutual fund transactions.

In a cross-appeal, the husband argues that the trial court abused its discretion in failing to hold that the postseparation increase in cash value of three life insurance policies is his separate property.

## II.

■ Although this court has twice addressed the status of a disability *pension* in the context of a marital dissolution, the court has never directly addressed the status of benefits from private disability insurance policies purchased with community funds.[1]

In *In re Marriage of Jones* (1975) 13 Cal.3d 457 [119 Cal.Rptr. 108, 531 P.2d 420] (hereafter *Jones*), the issue was whether a military disability pension received by an ex-serviceman, who had not acquired a vested right to retirement pension benefits, was his separate property or the property of the community. This court held that the disability pension was his separate property. (*Id.*, at p. 461.)

However, the rationale underlying the *Jones* decision has been substantially eroded, leaving it with little continued validity. In *Jones*, this court

---

[1] Other community property jurisdictions are not uniform in their characterization of disability benefits as community or separate property. (See generally Annot. (1979) 94 A.L.R.3d 176, 222-229.) In Idaho, New Mexico and Texas, disability benefits of several types have been treated as community property. (*Guy* v. *Guy* (1977) 98 Idaho 205 [560 P.2d 876] [group term disability policy]; *Hughes* v. *Hughes* (1981) 96 N.M. 719 [634 P.2d 1271] [civil service disability policy]; *Busby* v. *Busby* (Tex. 1970) 457 S.W.2d 551 [disability retirement benefits]; *Grost* v. *Grost* (Tex.App. 1977) 561 S.W.2d 223 [same]; *Anthony* v. *Anthony* (Tex.App. 1981) 624 S.W.2d 388 [federal workers' compensation benefits, to the extent that they replaced civil service disability benefits].) In other states, the status of disability benefits is less clear. For example, Washington has cases going both ways. (See *Chase* v. *Chase* (1968) 74 Wn.2d 253 [444 P.2d 145] [lump sum disability payment community property]; *Marriage of Huteson* (1980) 27 Wn.App. 539 [619 P.2d 991] [state-mandated disability retirement benefits separate property]; *Ross* v. *Pearson* (1982) 31 Wn.App. 609 [643 P.2d 928] [privately purchased disability policy community property]; *In re Marriage of Kittleson* (1978) 21 Wn.App. 334 [585 P.2d 167] [refusal to adopt "inflexible rule"].) The law in Arizona also seems unsettled. (See, e.g., *Flowers* v. *Flowers* (1978) 118 Ariz. 577 [578 P.2d 1006] [federal civil service disability policy and privately purchased disability policy both community property]; *Rickman* v. *Rickman* (1980) 124 Ariz. 507 [605 P.2d 909] [veteran's disability benefits separate property]; *Villasenor* v. *Villasenor* (1982) 134 Ariz. 476 [657 P.2d 889] [disability retirement pension divided into community and separate property components].)

held that a serviceman's right to disability pay acquired *before* he had a vested right to a retirement pension was not a community asset. (*Jones, supra,* 13 Cal.3d at p. 461.) At the time *Jones* was decided, only vested rights to retirement benefits were considered to be community assets. (*French* v. *French* (1941) 17 Cal.2d 775, 778 [112 P.2d 235].) The *French* case was overruled in *In re Marriage of Brown, supra,* 15 Cal.3d at page 851. The holding in *Brown* "undermine[d] the fundamental premise of *Jones:* that the award of a serviceman's 'disability' pension to the serviceman as his separate property would not impair any community interest of his spouse." (*Stenquist, supra,* 21 Cal.3d at p. 785.)

The *Jones* court also characterized disability payments as more analogous to personal injury damages than to retirement pay. (*Jones, supra,* 13 Cal.3d at pp. 462-464.) At the time *Jones* was decided, personal injury damages received after the couple separated were the separate property of the injured spouse. (*Id.,* at pp. 462-463; *Washington* v. *Washington* (1956) 47 Cal.2d 249, 254 [302 P.2d 569]; former Civ. Code, § 5126.)[2] Here, too, the law has changed.

Civil Code section 5126, which governs the treatment of personal injury damages in dissolution proceedings, was amended in 1979. (Stats. 1979, ch. 638, § 3, p. 1971.) ■ As a result, personal injury damages from a cause of action which arises during the marriage are now classified as a community asset, even if they are received after separation.[3] ■ ■ ■ ■ Hence, another fundamental premise of the *Jones* decision is no longer valid.[4]

---

[2]Prior to 1979, Civil Code section 5126 provided that "(a) All money or other property received by a married person in satisfaction of a judgment for damages for personal injuries . . . is the separate property of the injured person *if such money or other property is received* . . . [¶] (1) After the rendition of a decree of legal separation or a final judgment of dissolution of a marriage. [¶] (2) While either spouse, if he or she is the injured person, is living separate from the other spouse. [¶] (3) After the rendition of an interlocutory decree of dissolution of a marriage. . . ." (Stats. 1969, ch. 1608, tit. 8, p. 3342, amended by Stats. 1970, ch. 1575, § 5, p. 3286 and Stats. 1972, ch. 905, § 1, p. 1609, italics added.)

[3]After the 1979 amendment, the pertinent part of section 5126 reads: "(a) All money or other property received or to be received by a person in satisfaction of a judgment for damages for personal injuries . . . is the separate property of the injured person *if the cause of action for such damages arose* as follows: [¶] (1) After the rendition of a decree of legal separation or a final judgment of dissolution of a marriage. [¶] (2) While either spouse . . . is living separately from the other spouse. [¶] (3) After the rendition of an interlocutory decree of dissolution of a marriage." (Stats. 1979, ch. 638, § 3, p. 1971, italics added.)

[4]While personal injury damages from a cause of action which arises during the marriage are now community property (Civ. Code, § 5126), the method for assignment of those damages upon dissolution of the marriage is different than the assignment of other types of community property. Subdivision (a) of Civil Code section 4800 provides that community property shall be divided equally. However, subdivision (c) creates an exception. "Notwithstanding subdivision (a), community property personal injury damages shall be assigned

This court most recently addressed the status of a disability retirement pension in *In re Marriage of Stenquist, supra,* 21 Cal.3d 779. In *Stenquist,* the husband lost a limb, but remained in military service for 17 more years. At retirement, the husband, whose right to a retirement pension had vested, was entitled to take regular "retirement" pay at the rate of 65 percent of his basic pay or "disability" pay at the higher rate of 75 percent. Assuming that he would prefer the higher rate, the Army began to pay him disability benefits.

In the dissolution proceeding which was commenced after the husband's retirement, the trial court ruled that the portion of his disability pension benefits that was equivalent to what he would have been entitled to under the ordinary retirement pension constituted a community asset. (*Id.,* at p. 783.) Only that portion of the disability payments which could be attributed to military service prior to the marriage and the portion of the payments which *exceeded* the regular retirement pension were held to be his separate property. (*Id.,* at p. 788.)

In affirming the trial court's disposition, this court articulated two rationales. First, it held that it could not "permit the serviceman's election of a 'disability' pension to defeat the community interest in his right to a pension based on longevity." (*Stenquist, supra,* 21 Cal.3d at p. 786.) Such a result would "violate the settled principle that one spouse cannot, by invoking a condition wholly within his control, defeat the community interest of the other spouse." (*Ibid.*) It would unjustly deprive the wife of a valuable property right " 'simply because a misleading label has been affixed to [the] husband's pension fund benefits.' " (*Id.,* at pp. 786-787.)

Second, the *Stenquist* court discussed the purposes of a military disability pension. Such pensions were said to function in part to compensate the veteran for lost earnings and personal suffering caused by the disability. To that extent they were held to constitute separate property. (*Stenquist, supra,* 21 Cal.3d at pp. 787-788.)

However, the court recognized that a "disability" pension received later in life might function principally as a retirement pension. (*Ibid.*) Indeed,

---

to the party who suffered the injuries unless the court, after taking into account the economic condition and needs of each party, the time that has elapsed since the recovery of the damages or the accrual of the cause of action, and all other facts of the case, determines that the interests of justice require another disposition. In such a case, the community property personal injury damages shall be assigned to the respective parties in such proportions as the court determines to be just, except that at least one-half of the damages shall be assigned to the party who suffered the injuries. . . ." (Civ. Code, § 4800, subd. (c).) This provision represents an exception to the otherwise strict rule in California that community property must be divided equally. (See Civ. Code, § 4800, subd. (a); *In re Marriage of Juick* (1971) 21 Cal.App.3d 421, 427 [98 Cal.Rptr. 324].)

the court found that the "primary objective" of the disability pension in *Stenquist* was to provide retirement support. Therefore, it held that the portion of the disability pension that was equivalent to the regular retirement pension was community property. (*Id.,* at pp. 788-789.)

Following the *Stenquist* decision, several Courts of Appeal have held that the portion of employer-provided disability benefits that functions as retirement pay must be treated as community property. (*In re Marriage of Justice* (1984) 157 Cal.App.3d 82 [204 Cal.Rptr. 6]; *In re Marriage of Pace* (1982) 132 Cal.App.3d 548 [183 Cal.Rptr. 314]; *In re Marriage of Samuels* (1979) 96 Cal.App.3d 122 [158 Cal.Rptr. 38]; *In re Marriage of Webb* (1979) 94 Cal.App.3d 335 [156 Cal.Rptr. 334].) These courts reasoned that when the employee-spouse reaches the age at which he would be eligible for a retirement pension, "the predominate purpose of his [disability] benefits [] shift[s] to retirement support." (*In re Marriage of Pace, supra,* 132 Cal.App.3d at p. 553.)

Accordingly, disability benefits have been denominated community property to the extent that they equal the benefits foregone under a retirement pension. (*Ibid.*) Courts have determined the age at which the "shift" in purpose to retirement support takes place by looking to the age of retirement eligibility specified in the employment contract. (See, e.g., *id.,* at pp. 550-551 [age 55]; *In re Marriage of Justice, supra,* 157 Cal.App.3d at p. 89; *In re Marriage of Samuels, supra,* 96 Cal.App.3d at p. 128 [age 62]; *In re Marriage of Webb, supra,* 94 Cal.App.3d at pp. 339-340 [age 50].)

The purpose analysis utilized in *Stenquist* and its progeny is more difficult to apply in the context of this case. The husband's disability payments may serve all of the purposes discussed in those cases. However, it is difficult to determine what portion of the benefits serves each purpose, since there is no alternative retirement pension with which to compare the disability payments. Similarly, it is difficult to determine the *age* at which the benefits cease to compensate for the husband's lost wages and begin to provide retirement support. Were it not for his disability, the husband, as a self-employed physician, might have chosen to retire at 55 or he might have worked until he was 80.

There are two possible rules for apportionment of the disability benefits which would avoid the difficult factual determinations presented by this case. However, adoption of either of these rules would frequently result in inequitable distribution of property, contrary to "the protective philosophy of the community property law as set out in previous decisions of this court." (*Stenquist, supra,* 21 Cal.3d at p. 782.)

First, this court could hold that "disability" benefits provided by private disability insurance policies are always the separate property of the disabled spouse. However, since all or a portion of such disability payments may serve a retirement function, their characterization as the separate property of the disabled spouse would often " 'deprive [the nondisabled spouse] of a valuable property right simply because a misleading label has been affixed to [the disabled spouse's] *pension* fund benefits.' " (*Stenquist, supra,* 21 Cal.3d at pp. 786-787, quoting *In re Marriage of Cavnar* (1976) 62 Cal.App.3d 660, 665 [133 Cal.Rptr. 267], italics added.)

This court has already held that in the context of military disability pensions such an inequitable result is unwarranted. (*Stenquist, supra,* 21 Cal.3d 779.) No reason exists to allow such a result when the disability benefits are paid pursuant to policies purchased with community funds from private insurance companies.

The other possible rule would be to characterize all disability policies which are purchased with community funds as community property. Such a rule would provide for easy apportionment of the benefits, and would be consistent with basic community property principles since the source of the benefits is community property. (See 7 Witkin, Summary of Cal. Law (8th ed. 1974) Community Property, § 3, p. 5096.) But such a rule would also often lead to inequitable results.

The primary purpose of disability benefits is to compensate the disabled spouse for lost earnings—earnings which would normally be separate property after dissolution. (*Stenquist, supra,* 21 Cal.3d at p. 787.) If postdissolution disability benefits are held to be community property, a young ablebodied ex-spouse will be able to work and retain all his or her earnings, and will in addition be entitled to half the disability benefits of the disabled ex-spouse. This might impose a grave hardship on the disabled individual, who not only may not be able to work, but who may also require special equipment or extraordinary care.

In short, although application of the *Stenquist* purpose analysis may be difficult in this and other disability benefit cases, "[i]t does not impose a burden so heavy that for reasons of expediency [this court] must settle for the less equitable, all-or-nothing rule[s] [outlined above]." (*Stenquist, supra,* 21 Cal.3d at p. 785, fn. 4.)

The approach taken by this court in *Stenquist* provides for the most equitable distribution of disability insurance benefits. This approach requires that the trial court treat disability benefits as separate property insofar as they are intended to replace postdissolution earnings that would have been

the separate-property income of the disabled spouse, and treat the benefits as community property insofar as they are intended to provide retirement income. [5]

As indicated, especially in cases like the instant one, the determination of the intent of the parties regarding the purpose of the benefits will not always be easy. However, trial court judges have extensive experience in making such difficult factual determinations. The task is not so formidable that a simple, but inequitable, rule would be preferable.

Apportionment of the benefits need not be arbitrary or speculative. The court may consider testimony of the spouses' intent, both at the time the disability insurance was originally purchased and at the times that decisions were made to continue the insurance in force rather than let it lapse. Absent evidence of actual intent, the court may ascertain a normal retirement age at which the disabled spouse would have been most likely to retire had no disability occurred.

In fixing that age, the court may take into account any circumstances relevant to the normal expectations in the disabled spouse's community or former workplace about the age at which a person having the spouse's occupation, qualifications, and vocational history would retire. There may be evidence of the ages at which similarly situated workers have retired. A range of expected retirement ages may be derived from such sources as the federal schemes for social security and for individual retirement accounts, or from the provisions in governmental or institutional retirement systems for retirement of particular classes of employees. The nature of the disability policies at issue may provide evidence of the parties' intent or expectations.

Although the end result may be inexact in many cases, this solution is likely to produce far less harm than a rigid holding that all proceeds from disability insurance policies are the separate property of the disabled spouse or, alternatively, that all proceeds are community property.

---

[5]To the extent that it is inconsistent with the views expressed in this opinion, *In re Marriage of Donnelly* (1983) 142 Cal.App.3d 135 [190 Cal.Rptr. 756] is disapproved. The *Donnelly* court reasoned that the "income protection policy" at issue in that case was analogous to a life insurance policy purchased by the community during marriage, which is a community asset. (*Donnelly, supra,* 142 Cal.App.3d at p. 137; *New York L. Ins. Co.* v. *Bank of Italy* (1923) 60 Cal.App. 602, 606 [214 P. 61].) However, life insurance proceeds, unlike disability insurance benefits, can never be considered a substitute for subsequent earnings that would be separate property if accrued after separation of the spouses. By its very nature, life insurance purchased during the marriage with community funds is designed to make resources available to the surviving spouse after all possibility of gainful employment has been terminated by death.

On remand, the trial court must determine the extent to which the disability policies at issue were intended to provide retirement protection to both parties in their later years. The evidence indicates that rather than investing in a retirement plan, the husband chose to utilize community funds to purchase extensive disability coverage. With his long history of psychological problems, he may have been aware that he might not be able to continue the practice of medicine due to his disability.

There is no evidence that at the time the policies were purchased the parties contemplated dissolution. The husband may have chosen to protect the community's financial future through disability insurance rather than a retirement pension. Thus, the trial court may determine that the disability benefits in this case are entirely community property.

Alternatively, the court may determine that at least some portion of the benefits was intended as a substitute for the husband's future preretirement earnings. This portion of the benefits, if received after the parties' separation, must be denominated the husband's separate property.[6]

### III.

The wife also challenges five other aspects of the judgment.

■ First, she argues that the trial court abused its discretion when it held that the proceeds from a trust, labeled "Trust B," were community property. In August of 1974, the parties set up two trusts. "Trust A" contained approximately $100,000 in cash and stocks. "Trust B" contained $30,000 in cash, including the wife's previous earnings from a teaching job. The trust agreements stated explicitly that the contents of Trust A were community property, and the contents of Trust B were the wife's separate property.[7] The wife testified that Trust A was created to protect the community from improvident stock transactions by the husband.[8] She testified that Trust B was created to protect her separate property from similar improvident transactions.

---

[6]As previously noted, the trial court ordered the husband to pay the wife half of the disability payments as spousal support. On remand, the trial court is directed to redetermine spousal support in light of any recharacterization of the disability benefits as community property.

[7]The wife also claims that her earnings would have been her separate property if they had not been placed in Trust B. A written agreement signed by both parties in June 1973 provides in full: "[Wife's] pay is all hers for mad money to take off to far away places if she's smart enough to get mad enough." The husband testified that he believed the writing to be a joke.

[8]The wife was the trustee of Trust A. The trust agreement provided that the husband could not, by himself, make transfers to or from the trust.

The attorney who set up the trusts testified that the parties had told him that Trust B would be the wife's separate property and that the purpose of having two separate trusts was to keep the wife's separate property separate. He testified that the husband's mental capacity did not appear to be diminished at the time of the transactions.

The husband testified that he remembered only that he had signed a lot of papers and that the trusts were the attorney's idea.

The trial court, relying on the fact that the husband had been forced to close his practice by the medical society prior to the creation of the trusts, found the husband "was not competent to enter into the trust agreements and was not aware of the nature of his acts in declaring certain funds in 'Trust B' to be the separate property of his wife" and "was suffering under the undue influence of his wife and was not engaging in knowing and intelligent transactions."

In general, "[a] finding . . . that certain assets are community property 'is binding upon an appellate court if it is supported by sufficient evidence or if it is drawn from evidence which is conflicting or subject to differing inferences.'" (*In re Marriage of Walter* (1976) 57 Cal.App.3d 802, 805 [129 Cal.Rptr. 351].)

The wife argues that she is entitled to the rebuttable presumption that property, acquired prior to January 1, 1975, by a married woman pursuant to a written instrument, is her separate property. (Civ. Code, § 5110.) This presumption can be overcome only by clear and convincing evidence. (*In re Marriage of Ashodian* (1979) 96 Cal.App.3d 43, 47-48 [157 Cal.Rptr. 555].[9] However, the "'clear and convincing'" evidence standard was adopted "for the edification and guidance of the trial court," not as a standard for appellate review. If there is substantial evidence to support the trial court's finding, it cannot be disturbed. (*Crail v. Blakely* (1973) 8 Cal.3d 744, 750 [106 Cal.Rptr. 187, 505 P.2d 1027].)

Spouses may contract with each other to transmute community property into separate property. (See Civ. Code, § 5110.710.) However, transactions between spouses are "subject to the general rules which control the actions of persons occupying confidential relations to each other . . . ." (Civ. Code, § 5103.) To support a finding of undue influence, "[t]he

[9]As the *Ashodian* court noted, the presumption created by section 5110 was intended to protect a married woman's title to property at a time when husbands had exclusive management and control over the property of the community. Husbands lost that power in 1975 when the applicable provisions of the Civil Code were repealed. (*In re Marriage of Ashodian, supra,* 96 Cal.App.3d at p. 47; Stats. 1973, ch. 987, § 14, p. 1901.)

evidence, in addition to a showing of marriage relationship, must also show such unfairness of the transaction as will tend to establish that the wrongful spouse made use of the confidence reposed for the purpose of gaining an unreasonable advantage over the mate." (*Snyder* v. *Snyder* (1951) 102 Cal.App.2d 489, 492 [227 P.2d 847]; see also Civ. Code, § 1575 ["Undue influence consists: . . . [¶] In taking an unfair advantage of another's weakness of mind . . ."].)

Here, the trial judge made the following findings regarding the influence exerted by the wife over her husband: "[T]his is by no way indicting Mrs. Saslow, but the court finds that she could see that her husband was disabled in this matter, and also the court makes a finding that she felt in her heart with some justification that Dr. Saslow was not a good stock investor, and he was investing in the stock market, and she certainly maybe had a justified fear that he might dissipate all the community assets, and at her age there, she would be left out with nothing. So the court finds she embarked upon a situation where she was going to try to save what she could. The [doctor] became disabled. His medical practice was shut down. The court finds that he was in a state of mind of utter dismay and withdrawal; that upon Mrs. Saslow directing him and being after him to take care of this matter, put in trust and whatnot, at this time he's signing anything to appease his wife . . . ."

While the record would also support a finding that the contents of Trust B were the separate property of the wife, the evidence is conflicting. The record contains substantial evidence to support the court's finding that the husband was unduly influenced by his wife to enter into the trust agreements. Therefore, it cannot be said that the trial court abused its discretion in designating the contents of Trust B community property.

The wife next argues that the trial court erred in treating as community property seven life insurance policies which were purchased by the husband and then transferred to the wife. Five of the policies were transferred in 1967, the remaining two in 1974. The wife asserts that the husband intended the policies to be gifts to her. The husband states that the transfers were made solely for estate planning and tax purposes. They were not intended to transmute these community assets into separate property of the wife.

The trial court explicitly applied its finding of undue influence to the life insurance policy transfers as well as to the creation of the trusts. Two of the life insurance policies were transferred to the wife at the same time as the trust were created. Thus, the same evidence which supports the trial

court's conclusion of undue influence with respect to the creation of the trusts supports its conclusion regarding these policies.

Also, there is evidence in the record which supports a finding that the husband was susceptible to undue influence when the other policies were transferred in 1967. He was undergoing psychiatric treatment at that time. The nurse who had worked for him testified that it was around 1967 that he began noticeably to deteriorate.

Although there is contrary evidence in the record which suggests that the husband was very lucid and well-informed about his financial transactions, there is sufficient evidence to support the trial court's finding, and it will not be disturbed.

Next, the wife argues that the trial court erred in not requiring reimbursement to her of funds "loaned" to her husband from her separate property prior to and during the years of the marriage. These funds included numerous small sums totalling $1,740 which the husband received from the wife during the period the parties were dating and $3,000 the husband allegedly received from the wife after the parties were married. Finally, she claims a right to reimbursement for the proceeds from the sale of a house the wife was in the process of buying when the parties married. The couple lived in the house following their marriage and made payments with community funds, although the house remained in her name. When the house was sold several years later, the wife netted $9,659. She claimed and her husband agreed that the money from the sale of the house was her separate property. However, she testified that he took the check and she never saw it again.

Both parties argue that the applicable rule can be found in *See v. See* (1966) 64 Cal.2d 778 [51 Cal.Rptr. 888, 415 P.2d 776]. In that case, this court stated that "the party who uses his [or her] separate property for community purposes is entitled to reimbursement from the community or separate property of the other only if there is an agreement between the parties to that effect." (*Id.*, at p. 785.)

■■■ The rule in *See* is not applicable to the $1,740 the wife allegedly loaned to the husband *prior* to the marriage. ■■■ Normally, the jurisdiction of the trial court in a dissolution proceeding is limited to division of community property (*Reid v. Reid* (1896) 112 Cal. 274, 277 [44 P. 564]). It does not extend to the resolution of disputes regarding transactions which occurred before the marriage. However, since both parties have apparently "'voluntarily submitted the matter to a court having general jurisdiction to pass upon the question . . . under pleadings which properly raise[] [the] issue'" (*Porter v. Superior Court* (1977) 73 Cal.App.3d 793, 805 [141

Cal.Rptr. 59]), it was permissible for the trial court to render judgment on this issue. (See *ibid.*)

 The wife testified that the husband "borrowed" the $1,740. The husband does not dispute that he received the money or the amount at issue. Rather, he argues that it is "ludicrous" to require reimbursement of money which changed hands 20 years ago when the parties were dating.

Whether there was an agreement between the parties to repay the money was a question of fact for the trial court. The trial court apparently found that whether or not there was an agreement to repay, the money was subsequently dedicated to the community. This finding has support in the record. The wife's conclusory testimony that she believed that the sum was a "loan" is evidence that there was a specific agreement that the money was to be repaid. However, there is no additional evidence of the transaction, and there is no evidence that the wife requested repayment at any time during the 18 years the parties were married. Accordingly, the trial court's finding will not be disturbed.

 Similarly, the *See* rule is not directly applicable to the $3,000 loan allegedly made early in the marriage. The wife testified that the $3,000 was "strictly loaned" to the husband for the purpose of paying off a settlement agreement with his previous wife. The entire testimony of the husband with regard to the $3,000 was, "I remember nothing of that at all." The husband's indebtedness to his ex-wife was not a community obligation, but a personal one. If the wife loaned him $3,000 to pay to his ex-wife, it was not separate property used for community purposes as in *See* v. *See, supra,* 64 Cal.2d at page 785.

Whether the transfer was a loan or a gift to the husband depends on the wife's intent. (*In re Marriage of Frapwell* (1975) 49 Cal.App.3d 597, 601 [122 Cal.Rptr. 718].) The wife's testimony at trial that she intended it to be a loan is evidence of her intent. (*Ibid.*) However, the trial court found that "the various sums of money expended by [the wife] from her premarital estate from time to time for the benefit of the [husband] and the community were sums dedicated to the community . . . ." Although the trial court may have disbelieved the wife's testimony, the husband offered absolutely no evidence that the transfer was intended to be a gift. Instead, he testified that he did not remember the transaction. There is no substantial evidence to support the finding that the wife was not entitled to reimbursement of the sum of $3,000.

It is possible that the trial court concluded that this particular transaction never took place. Since it is impossible to ascertain from the record whether

that was the trial court's conclusion, the issue must be reexamined on remand.

■ The matter of the proceeds of the sale of the house is more complex. ■ The house had been purchased by the wife and her previous husband, who died in 1953. She continued to live in the house and to make payments with her separate funds. Hence, the house was her separate property. (Civ. Code, § 5107; *In re Marriage of Moore* (1980) 28 Cal.3d 366, 371 [168 Cal.Rptr. 662, 618 P.2d 208].) After the parties married, they resided in the house 'for nine years. ■ House payments and improvements were made with community funds, giving the community a pro tanto interest in the property "in the ratio that the payments on the purchase price with community funds bear to the payments made with separate funds," excluding payments for interest and taxes. (*In re Marriage of Moore, supra,* 28 Cal.3d at p. 372.)

■ In 1965, the house was sold for $14,300. Approximately $4,370 of that amount was used to pay off the mortgage. A check for the balance of $9,659 was issued to the wife. ■ A portion of the proceeds was community property, and the remaining portion was the separate property of the wife. (*In re Marriage of Moore, supra,* 28 Cal.3d 366.)

■ According to the wife's testimony, she gave the check to the husband because he wanted to use it to refinance their new home. However, the husband was unable to obtain the additional financing needed, and the proceeds of the check were never used for that purpose.

Since the check could not be used for that community purpose, the wife asked that it be considered her separate property and be placed in her separate account. The wife testified that the husband agreed to this arrangement. ■ This agreement transmuted the entire sum into the wife's separate property. (*See* v. *See, supra,* 64 Cal.2d at p. 785.)[10]

■ The wife testified, however, that she never saw the check again. The husband's testimony was as follows:

"[COUNSEL FOR MRS. SASLOW]: Did you get the check for ninety-five hundred dollars that came from the escrow for the sale of the MacDonald Way property?

"A: I can't answer that.

---

[10]Effective January 1, 1985, an oral agreement no longer serves to transmute community property to separate property. An agreement to transmute real or personal property must now be in writing. (Civ. Code, § 5110.730, subd. (a).)

"Q: You don't remember?

"A: I can't answer that, no. I don't know that." The trial court made no finding as to what happened to the check from the sale of the house. On remand, such a specific finding should be made. If the check was deposited in the couple's joint account, the wife should be reimbursed from community funds. If the husband cannot account for the check, the wife is entitled to reimbursement from his separate funds.

The wife also argues that she is entitled to reimbursement for community obligations which she claims to have paid out of her separate property following the separation. However, the payments appear to have been made from the proceeds of Trust B. Since the trial court's holding that Trust B was community property is supported by substantial evidence, this contention is without merit.

Finally, the wife asserts that the trial court erred when it failed to order a formal accounting for community funds which the husband obtained by forging her name to various documents. The forgeries allowed him to withdraw money from Trust A, to obtain loans against the life insurance policies, and to sell various stocks. The husband did not deny that he forged his wife's name to obtain the funds, but he insists the money was used to purchase other stocks which were community property. The trial court found that the husband neither attempted to defraud the wife nor willfully sequestered any funds. There is no evidence in the record to suggest that the trial court abused its discretion in failing to order an accounting.

In his cross-appeal, the husband asserts that the trial court should have awarded him the cash value generated by the operation of provisions in the life insurance policies which excused the payment of premiums upon his disability. The husband argues that the premium waivers are the equivalent of having the premiums paid out of the husband's separate property. He claims, therefore, that the portion of the value attributable to the premium waivers is his separate property, and he should be allowed to change the beneficiary of these policies. (See *Patillo* v. *Norris* (1976) 65 Cal.App.3d 209, 217 [135 Cal.Rptr. 210].)

This argument is without merit. The husband cites no authority for the novel proposition that the waiver of premiums due to disability generates cash value which should be treated as separate property. Further, the husband misconstrues the nature of the premium waivers. Because of the husband's disability, *there are no premiums* to be paid. Continued coverage is not costing the husband anything. He has not paid anything for the coverage

since *before* the dissolution. Accordingly, he is not entitled to any award based on the premium waivers.

## IV.

 The community property interest in benefits from a disability insurance policy purchased during marriage with community funds must be determined according to the analysis used by this court in *In re Marriage of Stenquist, supra,* 21 Cal.3d 779. That portion of the benefits intended by the parties to provide retirement support must be denominated community property. The portion of the benefits, if any, which was intended by the parties to replace the husband's lost earnings in the event of his disability must be considered his separate property. In this case, the trial court erroneously found that the benefits were the separate property of the disabled spouse.

Accordingly, the judgment is reversed. The cause is remanded for further proceedings to determine (1) the extent of the community interest in the disability policies, (2) the proper distribution of the benefits from the policies, (3) the proper amount of spousal support, (4) additional findings regarding the character of the other property at issue, and (5) proper distribution of that property as directed herein.

Mosk, J., Broussard, J., Reynoso, J., Grodin, J., Lucas, J., and Kaus, J.,* concurred.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.