Filed 4/18/18; Certified for Publication 5/17/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of LINDA M. and BRYAN S. MARSHALL. | |
| LINDA M. MARSHALL, | G053897 |
| Appellant, | (Super. Ct. No. 11D006621) |
| v. | O P I N I O N |
| BRYAN S. MARSHALL, | |
| Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Richard D. Vogl, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Affirmed.

Burch, Coulston & Shepard and Todd P. Coulston for Appellant.

Law Offices of Saylin & Swisher, Brian G. Saylin, Lindsey L. Swisher and Parris Trimble, for Respondent.

Linda Marshall appeals from the judgment on reserved issues following the dissolution of her marriage to Bryan S. Marshall.[1] Linda challenges two specific aspects of the family court's division of marital property. She contends the court erred declaring a 2006 capital gains tax liability to be a community debt, notwithstanding the fact she had obtained an "innocent spouse" determination from the Internal Revenue Service (IRS). Linda also contends the court erred in awarding Bryan the post-separation proceeds of a disability insurance policy as his separate property, despite the fact the policy had been purchased with community funds and was purportedly intended to serve as retirement income.

The court did not err. Thus, we affirm the judgment. As Linda acknowledges, the court was not bound by the IRS's innocent spouse determination in characterizing the tax liability, and we conclude its decision to treat the liability as a community debt, notwithstanding that determination, was supported by substantial evidence. Similarly, the court's conclusion that the disability insurance policy was intended to replace Bryan's earned income — rather than to operate as part of a retirement plan — was amply supported by the evidence. Because that factor determines whether the post-separation proceeds of the policy are treated as community property or the separate property of the disabled spouse, the court did not err by awarding the proceeds to Bryan.

FACTS

Bryan and Linda were married in 1984, and separated in July 2011. Linda worked as a registered nurse until 1987, and thereafter worked full time at home, acting as primary caregiver to the parties' four children.

---

[1] Because the parties share the same last name, we refer to each by their first name for the sake of clarity. No disrespect is intended.

Bryan worked as a dentist, and in 1989, the parties took out a loan to refurbish Bryan's dental office. As a condition of making the loan, the lender required that Bryan take out both a disability insurance policy and a life insurance policy. Bryan testified the disability policy was never intended to operate as a retirement policy. Indeed, when Bryan took out the disability policy to satisfy the lender's requirement, he already had what he described as a "retirement policy." The parties also contributed to IRAs and 401(k) accounts.

In 2002, Bryan became disabled as the result of a degenerative autoimmune disease, and he sold his dental practice. As a consequence of his disability, Bryan began receiving $10,000 per month in benefits under the disability policy.

The parties also owned the office building in which Bryan's dental practice had been located. After the practice was sold, they retained ownership of the building for a period, before finally selling it in 2006. The proceeds of the sale were invested in a limited partnership known as Orange Tree Lane, which was formed "to buy land and build an office condominium development."

However, according to Bryan, his original intention when selling the building had been to use the sale proceeds to purchase another property in accordance with Internal Revenue Code section 1031 — a "1031 exchange" — and thereby defer capital gains taxes on those proceeds. Unfortunately, Bryan was "somewhat misled by [his] accountant on how to do it," and "[w]hen it came time to filing, . . . he didn't file it as a 1031."

It was not until 2009 that the parties filed any tax return at all for 2006. And because of the 2006 sale of the office building, that belated return reflected capital gains of $1,735,615. As a consequence, the IRS assessed federal capital gains taxes of over $300,000 (including interest and penalties), and the California Franchise Tax Board (FTB) assessed capital gains taxes of approximately $265,000 (also including interest and penalties).

3

Linda testified at trial that she applied to both the IRS and the FTB for a determination she qualified as an "innocent spouse" for purposes of the 2006 capital gains tax liabilities, and that the FTB granted her request in part.[2]  Bryan testified he was aware Linda had applied for an innocent spouse determination, and he acknowledged filing an opposition to her request in "the proceeding" — albeit without identifying whether he filed his opposition in a proceeding before the IRS or the FTB.

Linda filed a trial brief covering many of the issues disputed between the parties, plus separate trial briefs addressing her claim that the 2006 tax liability should be allocated solely to Brian, and her claim that the disability insurance benefits should be treated as community property.

In her brief addressing the tax liability, Linda argued that while the trial court "isn't bound by the determinations of the Internal Revenue Service and Franchise Tax Board, the case law on the issue clearly provides that [Bryan] would have no standing before either the Internal Revenue Service or the Franchise Tax Board if he were to try to challenge their determination that [Linda] is an innocent spouse."  She argued that because Bryan had "a full right to be heard and to contest the determinations," those decisions "should be considered . . . to be res judicata as to the allocation of the 2006 tax debt."

---

[2]  Linda claims in her opening brief that the IRS also granted her request for innocent spouse relief, in full, but she cites no evidence in our record to support that assertion.  Instead, she cites "Exhibit 7," presumably a document admitted at trial but not included in our record, along with her counsel's argument.  However, argument is not evidence, and we cannot consider citations to evidence which is outside the appellate record.

Bryan does not directly challenge Linda's characterization of the facts. Instead, he merely acknowledges her assertion of innocent spouse status and explains why the evidence as a whole is nonetheless sufficient to support the trial court's decision on the issue.

4

Following the trial, the court issued a 31-page statement of decision, detailing the many rulings which comprised its judgment. With respect to the issue of the disability insurance policy, the court pointed out the parties had originally purchased the policy because it was required by a lender. It found their intention in doing so was to replace Bryan's earnings, rather than to provide for their retirement, and that intention never changed. The court also noted "the parties had invested in other assets (income producing realty) anticipating future retirement, had life insurance, and had IRA accounts." Based upon those findings, the court concluded the post-separation proceeds of the disability policy were Bryan's separate property.

And with respect to the tax liability, the court characterized Linda's argument as one based on the assertion that "federal law, specifically section 6013(e) of the Internal Revenue Code, preempts all state law efforts to impose liability for federal income taxes on anyone designated an 'innocent spouse.'" The court rejected the argument, however, pointing to case law stating that the IRS does not treat applications for "innocent spouse" designations as an adjudication of the rights *between* the spouses, and does not treat the other spouse as a party to the proceeding. The court concluded the "innocent spouse" determination would not be entitled to res judicata effect under California law because there was no evidence it was made by a "court of competent jurisdiction," nor that Bryan took any "*active* role" in the proceeding — even though he may have filed an "opposition" to Linda's application.

DISCUSSION

*Standard of Review*

"A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) Thus, "[i]t is appellant's burden

5

to affirmatively demonstrate error and where the evidence is in conflict, we will affirm the trial court's findings." (*Williams v. Russ* (2008) 167 Cal.App.4th 1215, 1224.)

"We review the trial court's resolution of factual issues under the substantial evidence test. [Citation.] Under that test, "'[t]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,"' to support the trial court's findings.' [Citation.] We review the trial court's conclusions of law under a de novo standard." (*Wilkinson v. Wiederkehr* (2002) 101 Cal.App.4th 822, 827.)

In this case, Linda contends we should apply de novo review to her claims because "both issues constitute mixed questions of law and fact where the questions of law predominate." We disagree.

"Mixed questions are those in which the "'historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated."'" (*People v. Cromer* (2001) 24 Cal.4th 889, 894.) In such cases, "[i]f the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test. If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently." (*Crocker National Bank v. City & County of San Francisco* (1989) 49 Cal.3d 881, 888.)

In this case, however, the alleged errors Linda identifies are not the product of the court's application of *established* facts to *undisputed* law. Rather, Linda's arguments rest on a series of more specific assertions, which, by turns, challenge the court's legal rulings and factual findings. We review each under the applicable standard.

*The Tax Liability*

Linda first contends the court erred by failing to allocate the 2006 capital gains tax liability in a manner consistent with the "innocent spouse" determination she received from the IRS and FTB.

Significantly, Linda acknowledges the court *is not bound* by the decisions of the IRS or FTB in deciding how to allocate the tax liability. But then argues, in essence, that the court nonetheless should have followed those decisions based on equitable principles. Her argument is analytically flawed for several reasons.

First, there is no discretion in the court's application of res judicata. The decision in a prior proceeding is either binding in the successive action, or it is not. The issue presents a pure question of law, and our review is de novo. (*City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210, 228 ["Whether the doctrine of res judicata applies in a particular case is a question of law which we review de novo."].) So by conceding the prior proceeding is *not binding*, Linda leaves no legal issue to be decided.

Second, Linda's argument that the innocent spouse proceeding should be accorded binding effect is internally inconsistent. She alludes to factors that might be considered in determining whether res judicata would apply,[3] pointing out that (1) Bryan

---

[3] "In its narrowest form, res judicata '"precludes parties or their privies from relitigating a *cause of action* [finally resolved in a prior proceeding]."'" [Citations.] But res judicata also includes a broader principle, commonly termed collateral estoppel, under which an issue '"necessarily decided in [prior] litigation [may be] conclusively determined *as* [*against*] *the parties* [*thereto*] *or their privies* . . . in a subsequent lawsuit on a *different* cause of action."'" [Citation.] [¶] Thus, res judicata does not merely bar relitigation of identical claims or causes of action. Instead, in its collateral estoppel aspect, the doctrine may also preclude a party to prior litigation from redisputing *issues* therein decided against him, even when those issues bear on different claims raised in a later case." (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 828.) "[C]ollateral estoppel will only apply if the party to be bound agreed expressly or impliedly to submit an issue to prior adjudication [citation] and had a full and fair opportunity to litigate [citation] . . . [citation]." (*Ayala v. Dawson* (2017) 13 Cal.App.5th 1319, 1327.)

would have no standing to challenge such a ruling before the IRS or the FTB; and (2) he had "a full right to be heard and to contest the determinations made by" both taxing authorities.

But when "[a] party lacks standing," it means the party "does not have an actual and substantial interest in, or would not be benefited or harmed by, the ultimate outcome of an action." (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 59.) Consequently, the determination that a party lacks standing will *preclude* the party from litigating an issue. (*Blumhorst v. Jewish Family Services of Los* Angeles (2005) 126 Cal.App.4th 993, 1000 ["We will not address the merits of litigation when the plaintiff lacks standing, because '"California courts have no power . . . to render advisory opinions or give declaratory relief."'"].) Thus, if Bryan had *no standing* to litigate Linda's "innocent spouse" claim before the IRS or FTB, he did not have a "full right to be heard and to contest" it.

Instead, as explained in *In re Marriage of Hargrave* (1995) 36 Cal.App.4th 1313, 1320 (*Hargrave*), an innocent spouse proceeding is not intended to adjudicate any rights as between the spouses. "[T]he IRS's only concern [in an innocent spouse proceeding] is the identity of the spouse to whom it will look for payment of the delinquent taxes in the first instance." (*Ibid*.) Thus, "*the IRS does not treat this as a determination of the rights and duties between the spouses.*" (*Ibid*., italics added.) Indeed, "[t]he federal government has no interest in how the states allocate tax liability between divorcing spouses, as long as they do not attempt to interfere with IRS collection efforts." (*Id.* at p. 1321.) And because the innocent spouse determination is not intended to allocate a tax liability as between the spouses, it cannot be accorded preclusive effect on *that issue.* (*Ayala v. Dawson, supra*, 13 Cal.App.5th at p. 1327.)

8

*Hargrave* also suggests the IRS determination of innocent spouse status is not subject to any particular formality: "[T]he determination of innocent spouse status is made at an administrative hearing or, as in this case, *during the course of informal negotiations.* (*Hargrave*, *supra*, 36 Cal.App.4th at p. 1320, italics added.) A decision reached in such a casual process does not comport with due process and thus does not warrant preclusive effect. (See *Ahmadi-Kashani v. Regents of University of California* (2008) 159 Cal.App.4th 449, 461, [holding a claim under California's Fair Employment and Housing Act not barred where internal grievance proceeding lacked sufficient judicial character to justify application of res judicata].)

Linda's attempts to distinguish *Hargrave* are unpersuasive. First, she points out that the potential preclusive effect of the innocent spouse determination was not raised in *Hargrave* until *after* the marital dissolution judgment had already been entered between the spouses, and thus it was untimely. The *Hargrave* court itself acknowledged that point, noting, "The time to raise all issues relating to distribution of marital debts, including the propriety of assigning one-half the federal tax burden to an 'innocent spouse,' was prior to entry of that judgment." (*Hargrave, supra*, 36 Cal.App.4th at p. 1321.) But that acknowledgement came only after the *Hargrave* court had already explained why the assertion failed *on its merits*. Thus, it did not affect the applicability of that analysis to this case.

Linda also suggests that because *Hargrave* addresses only an *IRS* proceeding, it cannot be relied upon to support the court's refusal to follow the *FTB's* determination of her innocent spouse status. However, the burden is on Linda, as appellant, to establish that a different rule is applicable to a FTB ruling, and thus that the trial court erred by applying the same analysis to both. She has made no effort to do that and has consequently waived the claim.[4] (See *Berger v. California Ins. Guarantee Assn.*

---

[4] Linda does point out, in her appellate brief, that Family Code section 2628 states the court "may" revise the parties "joint California income tax liabilities . . . in a

9

(2005) 128 Cal.App.4th 989, 1007 [argument waived when parties "fail to make a coherent argument or cite any authority to support their contention"]; *Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 [appellate court "will not develop the appellants' arguments for them"].)

Linda also argues that the IRS procedures for determination of innocent spouse status have changed since *Hargrave* — under current regulations, the non-requesting spouse is entitled to notice and an opportunity to submit information pertaining to a request for innocent spouse status — and thus she contends Bryan was given "the requisite notice and opportunity to be heard that was not present in the *Hargrave* case."[5] That may be true, but the bare opportunity to submit information pertaining to an issue under consideration does not equate to being *a party* to the proceeding in which the issue is decided. Nor does it expand the *scope of issues* to be decided in that proceeding. Linda does not contend otherwise.

For all of the foregoing reasons, the court did not err in failing to accord binding effect to whatever innocent spouse determination Linda may have received from the IRS or the FTB with respect to the parties' 2006 capital gains tax liability.

Alternatively, Linda argues the trial court should have allocated the capital gains tax liability in a manner consistent with the innocent spouse determination "because Bryan *breached his fiduciary duties* to Linda and the community in his management and control of the commercial building sale and [his] subsequent failure to timely file the

---

proceeding for dissolution of marriage . . . ." However, the statute does not impose any requirement that the court do so in any particular circumstances.

[5] The regulation Linda relies upon is 26 Code of Federal Regulations part 1.6015-6 (2002), which obligates the IRS to notify a "nonrequesting spouse" by mail of a proceeding seeking a declaration of innocent spouse status, and to "provide the nonrequesting spouse with an opportunity to submit any information that should be considered in determining whether the requesting spouse should be granted relief from joint and several liability."

parties' 2006 joint income tax returns." (Italics added.) But Linda cannot show error on appeal unless she demonstrates there was insufficient evidence to support the court's explicit finding against her on the issue of Bryan's alleged fiduciary breach. That burden is a heavy one: "'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient*. [Citation.]' [Citation.] '[W]hen an appellant urges the insufficiency of the evidence to support the findings it is his duty to set forth a fair and adequate statement of the evidence which is claimed to be insufficient. He cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked his responsibility in this respect.'" (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.) Linda has made no effort to satisfy that significant burden. Her argument that the tax liability should have been allocated differently fails.

*Characterization of Disability Insurance Benefits*

Linda also contends the court erred in ruling the proceeds of Bryan's disability insurance policy were his separate property. She first points to the general rule that "Property . . . acquired during the marriage is community property [citation] unless it is (1) traceable to a separate property source [citations], (2) acquired by gift or bequest [citation], or (3) earned or accumulated while the spouses are living separate and apart." (*In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1400.)

But as Linda acknowledges, a more specific rule applies to the proceeds of disability insurance policies because "[t]he purpose of term disability insurance . . . is to replace lost earnings." (*In re Marriage of Elfmont* (1995) 9 Cal.4th 1026, 1034.) Thus, the character of those proceeds will usually follow the character of the disabled spouse's earnings: "If during the marriage an insured spouse becomes disabled, the benefits received are community property because they replace community earnings. [Citation.]

11

If the benefits continue after the spouses have separated, they are the separate property of the insured spouse whose earnings they replace." (*Ibid.*)

Linda relies on a limited exception to that rule, applicable to cases in which the nondisabled spouse can establish that "during the marriage the premiums were paid out of community funds *with the intent that the benefits provide retirement income*." (*In re Marriage of Elfmont, supra,* 9 Cal.4th at p. 1034, italics added.) And Linda argues the court erred by not applying that exception.

We reject the argument. This issue is purely factual, and the court explicitly rejected Linda's contention that the disability policy had been purchased and maintained with the intent to provide for the parties' retirement. Instead, the court affirmatively concluded "the disability policy was purchased with the intent to replace the income stream of earnings for [Bryan], and the intent of the parties was not for a 'retirement' policy."

That factual finding was amply supported — not only by the evidence of the circumstances under which the policy had been purchased, but also by Bryan's direct testimony on the point. We are consequently bound by it.

Linda also argues that even if the disability benefits were properly considered to be Bryan's separate property earnings as of the time the parties separated, they should nonetheless be treated as retirement funds once Bryan has reached the "retirement portion of his life." (See *In re Marriage of Briltz* (1983) 141 Cal.App.3d 17, 20 (*Briltz*).)

Linda relies on *In re Marriage of Samuels* (1979) 96 Cal.App.3d 122 (*Samuels*) for the proposition that after Bryan reaches the minimum age of retirement, "the predominant purpose of such payments shifts to retirement support rather than disability compensation resulting from premature retirement [citation]; at that point the true character of the disability benefits . . . [citation] effectively constitutes community property . . . ."

12

However, in both *Briltz* and *Samuels*, the courts were faced with a situation in which the husband had reached the age where he was entitled to receive both disability benefits — his separate property — *and* pension benefits which were community property. The courts were concerned that the husband should not be allowed to manipulate or dissipate the wife's interest in the community pension benefits by electing to rely on his disability benefits in lieu of taking his retirement. Thus, it was held that "where the employee spouse elects to receive disability benefits *in lieu of a matured and vested right to retirement benefits*, only the excess over the retirement benefits constitutes compensation for [disability] and is, thus, the employee spouse's separate property. The amount received *in lieu of* matured retirement benefits remains community property subject to division upon the dissolution of marriage" (*Briltz, supra*, 141 Cal.App.3d at p. 20.)

In this case, there is no community retirement benefit at issue. Instead, because the trial court made an explicit finding that the parties' purpose in obtaining the disability insurance policy was *solely* to replace Bryan's earnings in the case of a disability, and *not* to operate as retirement funds,[6] those disability proceeds belonged entirely to Bryan. As such, his decision to "retire" at a given age, or to consider himself not retired, had no effect on Linda's community property rights. Consequently, both *Briltz* and *Samuels* are inapposite.

---

[6] Linda implicitly challenges the sufficiency of the evidence to support the finding that the parties made other provisions for their retirement. She argues that even though Bryan had a profit sharing plan, and the parties both had "small IRA accounts," at the time they separated, those assets were all liquidated in the post-separation period — "leaving them with no retirement income, retirement accounts, or pension plans as of the time of Trial." Her challenge is misplaced, however. The fact the parties made decisions which dissipated their retirement assets in the period between their separation and the trial does not alter the fact that they had made those provisions for retirement during their marriage. Nor does it undermine the court's conclusion that during their marriage, the disability policy was not intended to serve that purpose.

13

Finally, Linda argues the court was obligated to recognize that at some point a disabled spouse such as Bryan would have retired from active employment in the absence of the disability, and thus any disability insurance benefits received after that assumed retirement date would *necessarily* have been intended to operate as a retirement asset, rather than as the replacement for his wages.  The argument has some appeal, but ultimately it conflicts with *In re Marriage of Elfmont*, *supra*, 9 Cal.4th 1026, and *In re Marriage of Saslow* (1985) 40 Cal.3d 848 (*Saslow*), which affirm that "The primary purpose of disability benefits is to compensate the disabled spouse for lost earnings — earnings which would normally be separate property after dissolution." (*Saslow*, at p. 860.)

And while *Elfmont* and *Saslow* do authorize an apportionment of such benefits to the extent the court finds they were intended to provide a retirement benefit, *Saslow* specifies that such a finding should be based on the "testimony of the spouses' intent, both at the time the disability insurance was originally purchased and at the times that decisions were made to continue the insurance in force rather than let it lapse." (*Saslow, supra*, 40 Cal.3d at p. 861.)  It is only "[a]bsent evidence of actual intent, [that] the court may ascertain a normal retirement age at which the disabled spouse would have been most likely to retire had no disability occurred." (*Ibid.*)

Linda's argument flips *Saslow* around, suggesting the court must infer an intent to provide retirement benefits, based on an assumed retirement date, even if there was direct testimony bearing on the parties intentions.  Because we are bound by *Saslow*, we reject the argument.

For all of the foregoing reasons, the court did not err in its award of the post-separation disability insurance proceeds to Bryan as his separate property.

14

DISPOSITION

The judgment is affirmed.  Bryan shall recover his costs on appeal.

IKOLA, J.

WE CONCUR:

MOORE, ACTING P. J.

GOETHALS, J.

15

Filed 5/17/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of LINDA M. and BRYAN S. MARSHALL. | |
| LINDA M. MARSHALL, | G053897 |
| Appellant, | (Super. Ct. No. 11D006621) |
| v. | O R D E R |
| BRYAN S. MARSHALL, | |
| Respondent. | |

The Association of Certified Family Law Specialists has requested that our opinion filed on April 18, 2018, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports.


IKOLA, J.

WE CONCUR:


MOORE, ACTING P. J.


GOETHALS, J.