Filed 11/14/25  Estate of McMahon CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| Estate of DAVID J. McMAHON, Deceased.  _____  ESFIR VINER,   Plaintiff and Respondent,  v.  KIM SCHWARCZ, as Personal Representative, etc.,   Objector and Appellant. | A170193  (San Francisco City & County Super. Ct. No. CGC-18571704) |

In this proceeding for unpaid wages, Kim Schwarcz, as personal representative of the estate of David J. McMahon, appeals from a judgment after a jury trial awarding Esfir Viner approximately $132,550 in unpaid wages and waiting time penalties.  Schwarcz contends the verdict is not supported by the evidence, and specifically there is no evidence supporting the jury's findings as to Esfir's hourly rate of pay (for purposes of unpaid wages) and daily rate of pay (for purposes of waiting time penalties).  We affirm.

## BACKGROUND

David McMahon was an attorney who specialized in performing legal audits—i.e., he reviewed attorneys' fees for insurance companies and other

1

individuals and entities to insure they were reasonable and necessary, and the client was not overpaying. McMahon also testified at trials as an expert witness with respect to the reasonableness of such fees. To perform this work, McMahon was required to generate detailed audits of the billing records at issue.

In January 2016, McMahon left his law firm and went into business for himself, focusing on his legal audit work. He enlisted the services of Victoria Boyko, his former legal assistant; Bogdan Viner, Boyko's life partner who had a background in IT; and Esfir Viner, Bogdan's sister who had an accounting background.[1] After working together successfully for slightly over a year, McMahon's relationships with Boyko, Bogdan, and Esfir soured, and they ceased working for him.

In November 2018, Esfir filed a complaint against McMahon, alleging, as relevant here, causes of action for unpaid wages (Lab. Code, §§ 201, 204); waiting time penalties (*id.*, § 203); unfair business practices under the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.; UCL); and quantum meruit. Esfir also sought attorney fees (Lab. Code, §218.5) and interest (*id.*, § 218.6). Boyko and Bogdan filed similar complaints in September 2018 and April 2019, respectively.

In 2020, McMahon unexpectedly passed away. The probate court appointed Schwarcz, a professional fiduciary, as personal representative of the estate. Thereafter, Schwarcz was substituted into all three cases as the defendant. The three matters were ultimately consolidated for trial.[2]

---

[1] Since Esfir Viner's brother, Bogdan Viner, is also involved in these proceedings, we will refer to the Viner siblings by their first names to avoid confusion.

[2] On our own motion we take judicial notice of the appellate records in the two cases tried in conjunction with Esfir's case—No. A170254 (Bogdan)

2

### Summary of Trial and Related Proceedings

Jury trial took place over the course of seven days in July 2023. The evidence adduced included the following:

#### Testimony of Victoria Boyko

Boyko was born in Ukraine and, while a child, emigrated to San Francisco with her family. She graduated from college with a degree in finance and subsequently worked various office jobs, including as a finance manager and an accounting manager.

She met McMahon in 2013, when he offered her a job as an assistant at the law firm where he was a partner. Boyko was eventually hired as an independent contractor to help McMahon with his legal audits. Thereafter, the law firm merged with another firm. Boyko continued to work for McMahon. Among other tasks, she created marketing brochures at McMahon's request which introduced McMahon and Boyko as the firm's audit team.

During this timeframe, McMahon also recruited Bogdan, Boyko's long-term partner, to assist with his legal audit work.

Throughout 2015, McMahon spoke with Boyko about wanting to start his own company so he would have more control over his legal auditing business and less overhead. According to Boyko, McMahon wanted to create two entities—a law firm for his litigation work and a company for his legal audit work. As to the legal audit business, "he was looking for a partner to do the audits with and to support him in his audits." According to Boyko, the idea was that she and McMahon would be 50/50 partners in the audit business (which was approximately 90 percent of McMahon's total work). As

and No. A170449 (Boyko). (Evid. Code, §§ 452, subds. (c) & (d), 459, subd. (a).)

to the general litigation legal work (i.e., the remaining 10 percent of McMahon's work), Boyko would act as office manager, and when she assisted him as a paralegal, she would be paid by the hour. McMahon spoke of retiring in 10 years, at which time she would take over the audit business, with McMahon continuing to do marketing for the company. While McMahon filed papers with the Secretary of State and opened a bank account for the audit business (Fulcrum Litigation Management), he never prepared a written partnership agreement or fully utilized Fulcrum.

Around Christmastime, McMahon treated Boyko, Bogdan, and Esfir to a celebratory dinner at which McMahon stated he was ready to open a new company, with Bogdan doing IT and Esfir doing bookkeeping and accounting.

Early on, they had a meeting where McMahon explained they would not be paid immediately because clients often took 90 days or even more to pay for services. McMahon told Esfir she would be paid at market rate for her accounting services. An e-mail from McMahon was admitted into evidence confirming that Bogdan's rate of pay for IT services was $140 per hour. A document was admitted into evidence showing McMahon's billing rate of $450 per hour. No similar evidence was presented as to Bogdan's, Esfir's or Boyko's rate of pay per hour for legal auditing services.

Boyko would sit in on meetings with audit clients and would be introduced to them either as McMahon Law's audit director or partner. Boyko did not know at the time that she could not be a partner in a law firm because she was not a lawyer. With respect to the audit work, all her discussions with McMahon were partnership based, and the work was supposed to be conducted by a different entity than his litigation work.

4

The audits could be very complex. Boyko recalled one involving 25 million dollars of legal fees over the course of 10 years which included 18 different law firms, as well as related vendors and expenses.

After McMahon was hired to conduct an audit, Bogdan would take the digital files and "data map[]" them so that they could be merged into McMahon's proprietary audit software, which could read them and create reports. While this was being done, Boyko and McMahon went through a paper version of the files and assigned every entry on every invoice a specific code by hand. Boyko would then, under McMahon's supervision, enter the codes for each item into the audit software.

Although Boyko was hired to supervise staff and be McMahon's point person, she could not make a move without McMahon's instructions or authority. She never went to the bank without McMahon's authorization, and he usually accompanied her. McMahon would review all invoices before Boyko was allowed to authorize Esfir to pay them. She had to get permission from McMahon to contact clients.

The group used several offices. One was in the home shared by Boyko, Bogdan, their children, and Esfir, where McMahon had his own space and computer. Another was in the basement of a house McMahon owned in Mill Valley which was otherwise rented to tenants. A third was located in the home where McMahon lived with his wife. The fourth was a traditional office space with a conference room McMahon rented in San Francisco.

Boyko worked approximately 60 to 70 hours in a typical week and would work evenings and weekends as needed. She kept timesheets reflecting the billable hours she worked on audit cases.

She was paid infrequently because McMahon would only pay her after a client paid. Even then, he only paid Boyko for a portion of her work.

5

Boyko prepared a printout of all wages McMahon paid her, which was admitted into evidence. From April to July 2016, she received payments totaling approximately $200,000. She received payments in the same range in 2017. However, according to Boyko, the approximately $140,000 she was paid in February 2017 was due to the fact she had asked McMahon in January to start paying her what she was already owed and to prepare the partnership documents. McMahon said he would get back to her with respect to the partnership documents. But after that, her assignments and communications between the two started to decline.

After she received the February payment, McMahon asked to meet about the partnership. At a meeting on February 15, the two discussed the goals of the audit business and their positive working relationship. McMahon apologized for his previous actions and stated he wanted to continue the business. They made plans to meet two days later at the San Francisco office to go over an expert report that was being prepared for a client. McMahon said he would bring a written partnership agreement at that time.

On the morning of the scheduled meeting, McMahon called Boyko, crying and asking her not to leave him. At the time, she took this to mean that he did not want her to leave the business, as he had recently told her his wife had left him. When Boyko got to the meeting, however, McMahon proposed they not only work together but "be together" romantically. Boyko was shocked. She told him he needed to get himself together and that was not what their relationship was about. Then she left.

Boyko worked on her own on a client audit through February but then did no more work for McMahon.

Boyko created records of the time she worked in December 2016, January 2017, and February 2017. Her time was billed out to clients at $250 an hour, which was sometimes discounted to $210 if the client was given a discount. McMahon told her that her client billing rate would also be her pay rate.

According to Boyko, she was owed $140,000. Although she believed she was entitled to share in the profits of the company, she did not think she could ask McMahon for a 50/50 share because there was no written partnership agreement.

The following month, in March, McMahon texted Boyko, apologizing and saying he hoped they could be friends and get back to their business relationship. Although she did not see him in person, she heard from him by text throughout the month, and by e-mail even after that.

Boyko did not have a clear understanding of when her employment ended, but hypothesized it was in September. She was on vacation from March through May. By May, she had heard McMahon was refusing to pay people, but she continued to receive e-mails from him about twice a month on work matters. She still had access to McMahon Law e-mail and documents.

### *Testimony of Bogdan Viner*

Bogdan was born in Latvia and came to the United States when he was 16, where he received an associate's degree in computer science. He met McMahon through Boyko, and the two subsequently became friends. At some point, McMahon told him he was looking for help on some projects, with the idea of eventually starting his own company.

Bogdan then did some legal auditing work for McMahon, before McMahon left his law firm to go out on his own. Bogdan did the work at his home or at the firm's offices in the evenings. He was paid for this work

through A2Z, an LLC Bogdan created two years before meeting McMahon. Bogdan intended to use the entity for real estate sales but never did. McMahon and Bogdan used A2Z so McMahon could present Bogdan "as his legal auditor who, as a company, would do legal audits on his behalf."

McMahon prepared an invoice from A2Z for this initial project in the amount of $81,750, which was admitted in evidence and reflected both Bogdan's hours and the hours of others. McMahon also prepared a second invoice for this project, but Bogdan could not remember the amount of that invoice. The understanding between the two men was, when the client paid, they would split the payment 30 percent to Bogdan and 70 percent to McMahon. A check for $123,100 payable to A2Z was admitted into evidence representing the total the client paid for the project. A cashier's check for $102,026.80 from A2Z to McMahon was entered into evidence, and Bogdan testified it represented McMahon's 70 percent share.

After they concluded this trial project to see if they worked well together, McMahon decided to go out on his own. They had a celebratory dinner at the end of 2015 at which McMahon, Boyko, Bogdan, and Esfir were present. At the dinner, McMahon indicated he wanted Bogdan to be his IT specialist and continue to do legal audits. Boyko was to be his partner in Fulcrum Litigation Management. Esfir was asked to do accounting and possibly some legal auditing, but she could only work part time because she already had a full-time job.

McMahon told Bogdan he would be paid 100 percent of whatever negotiated hourly rate was charged for his time on a legal audit project. Their agreement was not in writing, but Bogdan did receive an e-mail from McMahon stating he would be paid $140 per hour for his IT work. There was also nothing in writing for the first audit representing an agreement as to

Bogdan's hourly rate of pay. Every legal audit was customized, and McMahon would sit next to Bogdan, training and supervising him in using the methodology McMahon had created for each specific audit. Bogdan did the work at his home office for subsequent projects and continued to be paid through A2Z. Bogdan kept his time in six-minute increments on his computer, printing it off monthly to give it to McMahon. McMahon would prepare invoices for clients after gathering everyone's timesheets. He would make calculations and then give them to Esfir to add to the invoice. A2Z was paid $263,749.74 by McMahon Law in 2016.

Bogdan worked on a legal audit in November and December 2016 for which he was never paid. Bogdan was also not paid for a legal audit he worked on from November 2016 through January 2017. McMahon had agreed to pay him $175 per hour for both projects.

Bogdan's home computer where he kept his timesheets was subsequently destroyed by a power surge.

### Testimony of Esfir Viner

Esfir came to the United States from Latvia at a young age. She eventually earned a college degree in accounting and worked as a full-time accountant.

Esfir confirmed that an electrical surge had impacted their home computer and many different electrical appliances in the house in May 2018. She made a claim to PG&E for the damage. All her individual timesheets stored on the home computer were lost.

Esfir first helped McMahon on a legal audit when he was with his prior firm in October 2015. That same month, he told Esfir he would like her to do accounting and bookkeeping work for him if he opened his own firm. At the time, she already had a full-time accounting job, so she told him she would

9

have to be part time. He told her he would research the market rate for her position, so he could pay her that.

At a celebratory dinner in December 2015, McMahon told Esfir she was qualified to work on legal audits, and he wanted her as part of his team. He explained to the group that he thought they worked well together and he was going to open his own firm. McMahon reiterated to Esfir that he wanted her to do part-time bookkeeping for him and that he was going to research what a reasonable part-time rate would be. He additionally told her she might also work on legal audits, and the amount she would be paid for that would be the amount he billed to his clients for her work.

Esfir started doing bookkeeping and accounting work for McMahon in January 2016. She followed McMahon's instructions when completing all her accounting work. She never wrote a check or did a distribution without McMahon's express authorization.

Esfir kept track of the approximate number of hours she worked during the first three months of 2016, which were about 35 hours per month. She told McMahon this number so he could investigate comparable pay rates. Esfir did not otherwise keep track of her monthly accounting hours, but they remained the same. In May 2016, McMahon agreed to pay her $3,000 per month for her accounting work. She was paid for the months of June 2016 through January 2017.

At McMahon's request, Esfir prepared an invoice for what she was owed for accounting for January through May 2016. The invoice, which was entered into evidence, reflected she was owed $15,000. McMahon told Esfir payment of the invoice would be deferred until the end of the year for cash flow purposes. She was never paid. Esfir received an e-mail in January 2017

10

from McMahon stating he was going to transition her away from the accounting work in favor of his tax accountants.

McMahon used a cash-based accounting software for the business. Esfir never entered data into the accounting software unless she was instructed to do so by McMahon. The software did not include what was owed or paid to employees, independent contractors, or vendors.

Esfir was involved in the creation of client invoices for McMahon from January 2016 through January 2017. She, Bogdan, and Boyko would provide their timesheets to McMahon. He would approve them and then use them, along with his e-mails and phone calls, to create his own time records. McMahon would then provide the data to Esfir, and she would input the date, description, and hours into an invoice template. Esfir would then print out a draft, which McMahon would revise. Once McMahon approved a final version, Boyko would convert it to a pdf and send it to the client. After an invoice was sent to the client, Esfir would input all the data into the accounting software. She also checked that the hours on the invoice for everyone matched the timesheets she had received. It typically took approximately 90 days for clients to pay their invoices. An income statement for McMahon Law for 2016 was admitted and showed net income of approximately $1,500,000 for the firm.

Esfir began working on legal audits for McMahon in November 2016. She calculated what she was owed for these services (as opposed to bookkeeping) to two clients by adding up all her hours listed on relevant McMahon client invoices. The invoice for January 2017 (prepared in February 2017) was a draft because she never received the final. Whenever she inputted the data from the final invoice sent to a client, she also compared the hours listed for everyone on their approved timesheets, and

there was never any deviation.  The invoices reflected her pay rate of $175 and the total number of hours she worked.  She could not say how many hours she worked on any particular day because McMahon would reallocate hours.  She was never paid for this legal auditing work.

### *Verdicts*

As to Boyko, the jury found no partnership had been formed with McMahon.  It also found facts establishing that Boyko was an employee of McMahon Law, rather than an independent contractor; that she performed work for McMahon; and that McMahon owed her wages.  However, the jury also found Boyko failed to prove the *amount* of wages she was owed and also failed to prove the *value* of the services she provided for purposes of quantum meruit.  It specifically found Boyko failed to prove an implied-in-fact contract to pay her wages in the amount billed to clients.  The jury therefore awarded her no damages.

In contrast, the jury awarded Esfir $95,515 in unpaid wages for auditing work and determined her daily rate of pay at the end of her employment was $634.51.  It also awarded Esfir $15,000 in unpaid wages for her accounting work.  The jury similarly awarded Bogdan $94,832.50 in unpaid wages and determined his daily rate of pay at the end of his employment was $637.90.

### *UCL Claims*

After the jury returned its verdicts, the trial court considered the parties' briefing and arguments on their UCL claims.  The court pronounced its decision on the record in mid-November, and subsequently filed a statement of decision, wherein it noted a judge cannot ordinarily " 'ignore the jury's verdict and grant equitable relief inconsistent with the jury's findings' " and that a UCL claimant may only obtain injunctive relief or restitution.  It

12

additionally observed a court has wide discretion whether to grant relief even when an unfair business practice has been shown.

The court found McMahon had engaged in an unfair business practice by mischaracterizing Boyko, Bogdan, and Esfir as independent contractors. But, as to Boyko, the court also found "Boyko was not a credible witness as to her claim of partnership with McMahon and as to her rate of pay. The court is not persuaded by Boyko's testimony that McMahon agreed to pay her 100% of the rate McMahon billed his clients for her work (i.e., a 100% 'pass-through' rate). The court finds Boyko's testimony in this regard to be in conflict with her other testimony where she claimed to be a 50/50 general partner which would have imposed upon her half of the overhead and other liabilities of the business. The court also finds Boyko's testimony of a pass-through rate inconsistent with other testimony and evidence about the methods used by McMahon to run his business." Thus, with respect to restitution under the UCL, the court found Boyko failed to prove she was harmed, the amount of any harm, or that McMahon was unjustly enriched, and that the amount already paid by McMahon to Boyko (over $400,000) was more than equitable.

In contrast, the court found Esfir and Bogdan were entitled to restitution but wholly offset the amounts " 'dollar for dollar' " by the amounts awarded by the jury as owed wages.

***Post-Trial Motions and Judgment***

Judgment was rendered in Esfir's case on December 28, 2023, awarding her $110,515 in unpaid wages plus $76,063.59 in prejudgment interest from

13

February 10, 2017. She was additionally awarded $22,035.30 in waiting time penalties, and attorney fees and costs according to proof.

In January 2024, Schwarcz moved for a new trial and/or judgment notwithstanding the verdict. She argued the only evidence McMahon had agreed to pay Esfir a "pass-through" rate for her legal audit work was the testimony of Esfir, her brother, and her sister-in-law, which was insufficient and contrary to reason. Moreover, because the court's UCL decision was based on the jury verdicts, a new trial on that claim was also required. After briefing and argument, the court denied both motions.

## DISCUSSION

On appeal, Schwarcz renews her argument that the jury's implicit finding with respect to Esfir's hourly rate of pay for audit services ($175) is not supported by substantial evidence. She also contends the daily rate of pay figure used by the jury to calculate waiting time penalties ($634.51) is not supported by substantial evidence. We are not persuaded by either claim.

The scope of our review of sufficiency of the evidence claims is well established. " ' "In a substantial evidence challenge to a judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]' [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment." ' " (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102.)

In addition, given the briefing in this case, we find it necessary to stress "[p]erhaps the most fundamental rule of appellate law"—i.e., "that the judgment challenged on appeal is presumed correct, and it is the appellant's

14

burden to affirmatively demonstrate error." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) " 'This means that an appellant must do more than assert error and leave it to the appellate court to search the record and the law books to test his [or her] claim.' " (*L.O. v. Kilrain* (2023) 96 Cal.App.5th 616, 619.) Rather, " '[i]n order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record. Rather than scour the record unguided, we may decide that the appellant has forfeited a point urged on appeal when it is not supported by accurate citations to the record. [Citations.] Similarly, we may disregard conclusory arguments that are not supported by pertinent legal authority.' " (*Champir, LLC v. Fairbanks Ranch Assn.* (2021) 66 Cal.App.5th 583, 597.)

Finally, as is particularly pertinent here, " ' "[w]hen an appellant urges the insufficiency of the evidence to support the findings it is [their] duty to set forth a fair and adequate statement of the evidence which is claimed to be insufficient. [They] cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked [their] responsibility in this respect." ' " (*In re Marriage of Marshall* (2018) 23 Cal.App.5th 477, 487; *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738 [" 'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient.*' "].) The failure to provide a fair summary of the evidence

15

forfeits the claim on appeal. (*Schmidlin,* at p. 738; accord, *Symons Emergency Specialties v. City of Riverside* (2024) 99 Cal.App.5th 583, 598.)

### *Hourly Rate of Pay*

As we have recited, Esfir testified at trial that she had an oral agreement with McMahon to pay her $175 per hour for the legal audit work she completed from November 2016 through January 2017—i.e., the amount McMahon billed clients for her time.

Schwarcz argues Esfir's testimony that she was entitled to a "pass-through" rate "strains credulity." She stresses that McMahon was not alive to contradict Esfir at trial. And she points to other evidence she asserts is inconsistent with such an exorbitant hourly rate. Specifically, she points to evidence that McMahon tended to micromanage all three of his employees, that his overhead for 2016 was 25 percent of his revenue, and that Esfir was a nonlawyer doing essentially data entry. In addition, when ruling on the parties' UCL claims, the court found Boyko's testimony regarding her rate of pay at a pass-through rate not credible, and Schwarcz argues this finding is equally applicable to Esfir's hourly rate of pay. At bottom, Schwarcz's complaint is best summarized by this statement in her briefing: "It simply defies logic that a person would open a business, assume liabilities for same, spend his time overseeing the work of his staff (when he could have been billing his own time at higher rates), and then paying said staff the exact rate he stood to collect from clients without reduction."

The short answer to Schwarcz's argument is that the testimony of one witness is sufficient to establish a fact (*In re Marriage of Fregoso & Hernandez* (2016) 5 Cal.App.5th 698, 703), and, when reviewing for substantial evidence, we do not make credibility findings (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330 [assessing witness credibility is "the

16

exclusive function of the trier of fact"]). Here, the jury clearly believed Esfir, and that is sufficient to support the verdict.

The trial court's subsequent finding, when considering the UCL claims, that Boyko's testimony that she was entitled to a pass-through rate was not credible supports, rather than undercuts, this conclusion as Schwarcz suggests. Boyko's situation was clearly factually distinguishable from that of Esfir and Bogdan.

Moreover, even if we were to put aside the fact that Schwarcz presented *no* evidence at trial that Esfir's rate of pay was commercially unreasonable, we can conceive of reasons why McMahon paid Esfir $175 per hour. For example, before deciding to go out on his own, McMahon carefully vetted Esfir's and Bogdan's ability to assist with his legal audits, and he could reasonably have concluded the two needed to be paid at a rate that would keep them loyal to the new business and disinclined to look for other employment opportunities. In addition, legal auditing performed by Esfir and Bogdan—for which the methodology changed with each client—could reasonably be viewed as more complex than the simple data entry performed by Boyko. Further, Boyko testified McMahon wanted to go out on his own because he was tired of corporate overhead and wanted more control over his business. McMahon was billing himself out at $450 per hour, and, based on the record before us, he could have been billing his supervisory time out at that same rate in addition to billing that same time for Esfir and Bogdan. Finally, there is some evidence in the record that McMahon might have been overcompensating all three of his employees because he had a romantic

interest in Boyko and was trying to show her how financially generous he was.

In short, while we can understand Schwarcz's frustration that McMahon was not available to contradict Esfir with respect to her rate of pay, she has failed to establish that insufficient evidence supported the jury's finding on this point. We also note that Schwarcz was equally hampered by McMahon's own abysmal paperwork and failure to memorialize in writing his compensation arrangements with Esfir, Bogdan, and Boyko.

### *Waiting Time Penalties*

With respect to Schwarcz's second claim—that the daily rate of pay the jury set for purposes of calculating Esfir's waiting time penalties ($634.51) was not supported by substantial evidence—her briefing runs afoul of the appellate maxims we have recited. Specifically, Schwarcz failed to acknowledge in her briefing *any* evidence favorable to the jury's finding on this point, making only a conclusory argument devoid of any citations to the record. Schwarcz has therefore forfeited this issue.

Even if she did not, the record contains evidence supporting the jury's finding.

The jury was properly instructed that to recover waiting time penalties, Esfir had to prove her daily wage rate *at the time her employment with David McMahon ended*. Esfir testified that her legal auditing work, the only work that is at issue on appeal, ended in January 2017.

Accordingly, to calculate her daily rate of pay at that time, the jury had to divide the amount she billed in January for that work by 31. And that is exactly what it did. The jury awarded Esfir $95,515 in unpaid wages (545.80 hours at $175 per hour). Invoices for Esfir's unpaid legal auditing in November and December 2016 amounted to 433.40 hours. If she worked the

18

remaining 112.40 hours (545.80 hours minus 433.40 hours) in January at $175 per hour, she was entitled to be paid $19,670 for January, and $19,670 divided by 31 days is $634.51.[3]

## DISPOSITION

The judgment is affirmed.

---

[3] There is no merit to Schwarcz's argument that Esfir's hourly rate of pay (for purposes of her failure to pay wages claim) and her daily rate of pay at the time her employment ended (for purposes of determining waiting time penalties) conflict with each other. She ignores that the daily rate of pay for purposes of waiting time penalties applies only to a single month, January. Her argument is also based on an assumption—that Esfir worked 8-hour days or 40-hour weeks—that is contrary to the evidence.

_____

Banke, J.

We concur:

_____

Humes, P.J.


_____

Langhorne Wilson, J.

A170193, Viner v. McMahon